(137 P.3d 1051)
No. 94,927

IN RE TAX APPEAL OF YELLOW FREIGHT SYSTEM, INC. and YELLOW EQUIPMENT AND TERMINALS.

YELLOW FREIGHT SYSTEM, INC., and YELLOW EQUIPMENT and TERMINALS, *Appellees,* v. JOHNSON COUNTY BOARD OF COUNTY COMMISSIONERS, *Appellant.*

Opinion filed July 14, 2006.

*Kathryn D. Myers,* assistant county counselor, for appellant.

*Linda Terrill,* of Neill, Terrill & Embree, L.C., of Leawood, for appellees.

Before McANANY, P.J., MARQUARDT and CAPLINGER, JJ.

MARQUARDT, J.: The Johnson County Board of County Commissioners (County) appeals the district court's decision reversing the Board of Tax Appeals (BOTA), which had found in favor of the County regarding the value of Yellow Freight System, Inc.'s (YFS) and Yellow Equipment's property for the 1999, 2000, 2001, and 2002 tax years. We reverse.

YFS's property at issue is their corporate headquarters. The YFS's Johnson County building has approximately 342,003 square feet and YFS is the only tenant. One witness testified that the building is located in an area that is "ideal" for an office building because it is in the "highest valued area" in the county.

YFS objected to the County's valuation of its property in 1999 and 2000. After a hearing with testimony and arguments of counsel, BOTA concluded that the current use as a single tenant office space was its highest and best use. BOTA found that "the County's recommended values, as supported by the income approach, better reflects the fair market value of the subject property than the values recommended by the Taxpayer." Accordingly, BOTA valued the

property at $25,364,800 for 1999 and $23,703,100 for 2000. YFS filed a motion for reconsideration which was denied. YFS filed a petition for judicial review with the district court.

For the 2001 and 2002 years, the County valued YFS's property at $24,178,000 and $23,806,500 respectively, using the income method of valuation. YFS challenged the County's 2001 and 2002 valuations, and a hearing was held before BOTA in August 2003.

At the hearing, both parties stipulated that the 1999 and 2000 proceedings should be made part of the record for the 2001 and 2002 valuations. YFS presented no witnesses at this hearing and relied on the record before BOTA from its 1999 and 2000 hearings. After examining the evidence, BOTA again agreed that the County met its burden of proof by showing its recommended values for the subject property were appropriate. YFS's motion for reconsideration was denied. YFS filed another motion for judicial review with the district court.

The district court consolidated the 1999, 2000, 2001, and 2002 appeals into one case which was heard in December 2004. At the hearing, no testimony was taken and the only evidence before the district court was the record from the BOTA hearing. The district court determined that BOTA did not have substantial evidence to support its decision. The district court reduced YFS's property value to the levels suggested by YFS, which were $12,000,000 for 1999 and $13,750,000 for the years 2000, 2001, and 2002. The County timely appeals.

### Standard of Review

In general, the standard of judicial review of a state administrative agency action is defined by the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq. National Council on Compensation Ins. v. Todd*, 258 Kan. 535, 538, 905 P.2d 114 (1995). The district court may grant relief from a BOTA order if: (1) the agency erroneously interprets or applies the law; (2) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure; (3) the agency action is based on a determination of fact not supported by evidence that is substantial, when viewed in light of the record as a

whole; or (4) the agency action is otherwise unreasonable, arbitrary, or capricious. K.S.A. 77-621(c)(4), (5), (7), and (8).

The district court may not substitute its judgment for that of an administrative agency. *Lacy v. Kansas Dental Board,* 274 Kan. 1031, 1040, 58 P.3d 668 (2002). BOTA exists to decide taxation issues. Its decisions are given great weight and deference when it is acting in its area of expertise. *In re Appeal of Sprint Communications Co.,* 278 Kan. 690, 694-95, 101 P.3d 1239 (2004). YFS claims that the County has the burden of proof in this case. The party challenging BOTA's decisions has the burden of proving that the action taken was erroneous. K.S.A. 77-621(a)(1). In reviewing a district court's decision that reviewed an agency action, this court must determine whether the district court followed the requirements and restrictions placed upon it. *Lacy,* 274 Kan. at 1040. Interpretation of a statute is a question of law over which our review is unlimited. *Matjasich v. Kansas Dept. of Human Resources,* 271 Kan. 246, 250-51, 21 P.3d 985 (2001).

On appeal, the County claims that the district court erred in: (1) determining that the evidence presented by the County was insufficient to support its valuation; (2) holding that the County failed to determine the highest and best use of the property; and (3) applying YFS's proffered value for 2000 as the value of the real property for the years 2001 and 2002.

### Sufficiency of the Evidence

Property valuation in Kansas is governed by K.S.A. 79-501 *et seq.* K.S.A. 2005 Supp. 79-503a requires that the appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal procedures which are adaptable to mass appraisal and consistent with the definition of fair market value, unless otherwise specified by law. K.S.A. 79-504 states that appraisals produced by the computer assisted mass appraisal (CAMA) system that are prescribed or approved by the Director of Property Valuation (PVD) shall be deemed to be written appraisals that fulfill the statutory requirements.

The Appraisal Standards Board publishes the Uniform Standards of Professional Appraisal Practice, commonly referred to as USPAP. In November 1992, the PVD adopted appraisal directive No. 92-006 which incorporated by reference the USPAP. This directive requires the county appraiser to perform all appraisal functions in conformity with Standard 6 of the USPAP. The record on appeal does not reflect that any subsequent changes to the USPAP were adopted by the PVD.

In this appeal, USPAP Standards 1, 2, and 6 are relevant. Standard 1 is "directed toward the substantive aspects of developing a competent appraisal." USPAP, Standard 1, Comment, p. 9 (1992). Standard 2 "governs the form and content of the report that communicates the results of an appraisal to a client and third parties." Standard 2, p. 15 (1992). Standard 6 deals with mass appraisals. Standard 6, p. 29 (1992). Standard 6-2 establishes the guidelines which should be observed when performing mass appraisals. Standard 6-2, p. 30 (1992).

USPAP also includes a departure provision. This provision "permits limited exceptions to sections" that are classified as specific requirements rather than binding requirements. USPAP, p. 5 (1992). One important departure standard is the jurisdictional exception rule, which allows an appraiser to void any requirement which would be "contrary to the law or public policy of any jurisdiction." USPAP, p. 6 (1992).

YFS argues that the County's mass appraisal does not conform to the USPAP standards.

Stanley Moulder testified for the County at the 1999 and 2000 hearings. YFS claims that Moulder was merely a records custodian. The record on appeal reveals that he was very familiar with the property and detailed how the County came up with the valuation. He was questioned about whether his report qualified as a "written summary report for mass appraisal" pursuant to USPAP standards. Moulder stated "this appraisal report may or may not comply with the exact wording in USPAP, but it does comply with the directives from PVD." Moulder claimed that a jurisdictional exception applied and, therefore, the appraisal report complied with Kansas law.

Moulder agreed that pursuant to Kansas law, appraisal reports must comply with USPAP Standard 6. Moulder also acknowledged that the CAMA system did not include a sales comparison component for commercial properties because of the lack of comparable sales. John Hill, YFS's appraiser, agreed that there were no comparable sales available for comparison.

YFS's witness Kenneth Voss, a real estate tax consultant and independent fee appraiser, did not do a technical appraisal of the property but reviewed Moulder's appraisal report to "provide an opinion on jurisdictional exception and whether it conformed to Standard 6 or Standards 1 and 2." Voss testified that Moulder's report included information that was not part of a mass appraisal process. Voss also testified that Moulder's report could only comply with Standard 6 if the extraneous data were removed. The items complained of by Voss are those that are mandated by K.S.A. 79-504. Voss' testimony is contradicted by Kansas law.

At the 2001 and 2004 hearings before BOTA, YFS's motions in limine were heard. YFS wanted to keep part or all of Moulder's mass appraisal from being admitted. Moulder testified that he performed both income and cost approaches to determine value, but relied on the income approach because "office buildings in Johnson County are bought and sold as investment type properties with income expense information which relates to that being plentiful." He stated that the cost approach was not used because there are problems with that approach. BOTA admitted the mass appraisals in both cases.

YFS asserted in oral argument before the district court that this court's holding in *Board of Saline County Comm'rs v. Jensen*, 32 Kan. App. 2d 730, 88 P.3d 242, *rev. denied* 278 Kan. 843 (2004), supports its position. There are many factors that distinguish *Jensen* from YFS's case.

*Jensen* was dealing with three separate parcels of property, one consisting of 30 multifamily units, a building containing 18 two-bedroom apartments, and a three-building, 27-unit condominium complex. Here, we are dealing with a single building with one tenant.

In *Jensen*, when valuing one of the parcels, the district court found that the County's witness did not perform the county's appraisal, could not testify as to whether elements of the valuation were reasonable, had not been on the property, and generally seemed unaware of the details behind the appraisal. This court in *Jensen* concluded that the district court properly ruled that BOTA's valuation as to one of the appealed valuations was not supported by substantial evidence in light of this testimony, noting: "The County's initial appraisal standing alone cannot be sustained absent supporting evidence of its validity and correctness, and such evidence should be provided by someone with appraisal experience who is familiar with the property, the appraisal, and the local market for such properties." 32 Kan. App. 2d at 739.

On appeal, the County argues that the district court incorrectly applied *Jensen* and misinterpreted applicable Kansas law. The County contends that state law requires a written appraisal, and the report produced by CAMA is a written appraisal which meets the statutory requirements.

K.S.A. 79-504(b) states:

" 'Written appraisal' means a written statement used in connection with the activities of the division of property valuation or a county appraiser that is independently and impartially prepared by a county appraiser setting forth an opinion of defined value of an adequately described property as of a specific date, supported by presentation and analysis of relevant market information. Appraisals produced by the computer assisted mass appraisal system prescribed or approved by the director of property valuation shall be deemed to be written appraisals for the purposes of this act."

The district court found that BOTA relied exclusively on Moulder's report and testimony, then concluded that BOTA's valuation of YFS's property was not supported by substantial evidence. The district court stated that Moulder "testified only that he was there to identify the records and that this is what the records showed and that he had no opinion." The district court completely ignored the depositions and testimony of Moulder. Moulder testified extensively, explaining how the system produces a value and the value represents the fair market value as defined in K.S.A. 79-503a. Moulder is a commercial research specialist, a certified assessment

evaluator, a general real estate appraiser, and a registered mass appraiser. Moulder had been on YFS's property personally as recently as March 16, 2000, when he recorded the basic characteristics of the improvements, definitions of the structure including walls, foundation, land size, and building size; he knew the property well. Moulder had also reviewed other commercial properties.

Moulder's testimony is far different from that given by the witness in *Jensen*. We agree with the district court's finding that Moulder is likely "capable" and "qualified." The CAMA appraisal produced by the County and introduced by Moulder fits within the definition of a written appraisal specified in K.S.A. 79-504(b). BOTA's decision was supported by substantial evidence.

### Highest and Best Use

In its journal entry, the district court found that the County failed to determine the highest and best use of the property.

Moulder testified that he did not do a highest and best use analysis; however, he testified that "the highest and best use is the current use unless we have reason to believe or data to support a difference."

According to testimony at the BOTA hearing, there are four criteria used to determine the highest and best use of a property. The use must be legally permissible, physically possible, financially feasible, and maximally productive. USPAP Standard 6-2(h) holds that when developing a mass appraisal, the appraiser must observe certain specific appraisal requirements, including "the highest and best use of the property." USPAP, p. 31 (1992). The Comment to the subsection notes that, "In considering highest and best use, an appraiser should develop the concept to the extent required for a proper solution to the appraisal problem." USPAP, p. 31, (1992). Moulder elaborated that there was no "market information" to suggest a highest and best use as a single tenant corporate headquarters. He testified that "[t]here was no reason to believe that its current use wasn't the highest and best use. There is no market information to indicate otherwise . . . . [t]here was nothing about the property in its appearance or anything from the owners that

would indicate otherwise." Moulder's evaluation of the highest and best use fits within the criteria.

We recognize the frustration stated by YFS in trying to overturn a CAMA appraisal done by the County. In order to attack the appraisal, a taxpayer must find fault with the program or demonstrate that the information put into the computer was faulty. Instead, YFS brought in appraisers to testify about value and then attack the CAMA appraisal that is specifically allowed by Kansas statutes.

John Hill testified on YFS's behalf. Hill testified that in his expert opinion, the purpose of the appraisal was to estimate the fee simple market value of the property. In so doing, Hill believed the main issue was determining the highest and best use of the property. In the process of performing his appraisal, Hill reviewed the Kansas City market and determined that it was very difficult to sell a corporate headquarters facility. In Hill's opinion, the highest and best use of the property was as a multitenant building due to local demand for smaller blocks of space.

Upon questioning from BOTA members, Hill explained that the appraisal must be done with the assumption the property was for sale. Hill made the assumption of the fiction that the property was vacant and available, and BOTA must look at alternative uses for the property based on market demands. For that reason, Hill believed it was essential to evaluate the local market and determine greatest demand, which might involve a change in the property's highest and best use.

YFS produced Bruce Pickering, a real estate appraisal consultant and an expert witness, to determine the property's highest and best use. He believed that if the highest and best use was inaccurate, the valuation of the property would be similarly inaccurate. Pickering testified that if there were another corporate headquarters user available to purchase YFS's vacant property, that would be the highest and best use of the property. The next highest and best use would be with a single tenant, and if that was not possible, then it would be used for multiple tenants. However, Pickering also believed that trying to sell the property to another corporate headquarters user would result in a lengthy wait for a buyer, with the

seller carrying the costs of the property until a buyer could be located. In Pickering's experience, it could take 3 or 4 years to find a corporate headquarters user in the Kansas City market. In contrast, he believed a multi-tenant investor could be located within a year.

Hill stated that the highest and best use demand for a property depends on "potential utility," rather than current use. In contrast, Moulder testified that he never entertained any thought about a potential sale of the YFS property and instead focused on the current use of the property. BOTA found that YFS's multi-tenant highest and best use was conjecture.

There was testimony about the highest and best use before BOTA from both parties, and the district court erred in finding that the County presented no evidence on the highest and best use. BOTA weighed testimony from County and YFS witnesses and chose to rely on the County's witnesses' testimony.

### Property Value for 2001 and 2002

The district court valued YFS's property at $13,750,000 for tax years 2000, 2001, and 2002. YFS presented no evidence as to the value of the property for 2001 and 2002. On appeal, the County argues that the district court merely carried the proffered 2000 value forward for the next 2 years, ignoring the independent evidentiary hearing covering tax years 2001 and 2002.

The County is correct that YFS presented no evidence at the 2001/2002 hearing. On the record, YFS indicated it was going to "rely on the record as brought in in the initial motion." This record included the hearings for tax years 1999 and 2000, which was made part of the record pursuant to a joint motion from the parties. The BOTA order from the 2001/2002 hearing indicates that BOTA relied on that record when making its decision.

It seems clear that YFS intended to present the same arguments to BOTA for the 2001 and 2002 tax years. However, there is no evidence in the record on appeal as to how market influences in 2001 and 2002 could have altered the value of the subject property after 2000. This is especially noteworthy because much of the testimony regarding the market climate in the Kansas City area was

influenced by the "Sprint effect," which could have changed by 2002.

The County argues on appeal that it presented the only estimate of value for the 2001 and 2002 tax years. This assertion is true, as the County's testimony placing the value at $24,178,000 for 2001 and $23,806,500 for 2002 was the only evidence specific to those tax years that was put before BOTA. Given the uncontroverted nature of this testimony, the district court erred by adopting YFS' proffered value for 2000, which was not supported by any evidence. The County's figures for 2001 and 2002 are the only evidence and should have been accepted by the district court.

The district court's ruling is reversed.