(283 P.3d 823)
No. 105,769

In the Matter of the Equalization Appeal of JOHNSON COUNTY APPRAISER/PRIVITERA REALTY HOLDINGS for the Tax Year 2008.

—

Opinion filed July 27, 2012.

*Linda Terrill*, of Neill, Terrill & Embree, P.A., of Leawood, for appellant Privitera Realty Holdings.

*Kathryn D. Myers*, assistant county counselor, for appellee Board of Johnson County Commissioners.

Before LEBEN, P.J., STANDRIDGE and ARNOLD-BURGER, JJ.

STANDRIDGE, J.: Privitera Realty Holdings (Privitera) appeals the Kansas Court of Tax Appeals' (COTA) decision reinstating the original value that the Johnson County Appraiser (County) assigned to property that Privitera owns in Overland Park, Kansas, for the tax year 2008. For the reasons stated below, we find substantial evidence supports COTA's decision.

## FACTS

The property at issue is a fast-food restaurant built in 1989 and located in front of a community shopping center at the intersection of 119th Street and Metcalf Avenue in Overland Park, a heavy retail intersection. Notably, the restaurant houses three fast-food chains under one roof—Kentucky Fried Chicken, Taco Bell, and Pizza Hut. This "KenTacoHut" is the only one of its kind in Johnson County.

For 2008, the County assigned a value of $1,774,450 to the KenTacoHut for ad valorem tax purposes. Privitera appealed the tax assessment to the small claims and expedited hearings division of COTA. The hearing officer presiding over the matter concluded

that Privitera's recommended value of $1,393,200 better reflected the fair market value of the KenTacoHut compared to the value assessed by the County. Accordingly, the hearing officer reduced the assessment to $1,393,200.

The County appealed the decision of the hearing officer to the regular division of COTA. At the evidentiary hearing before COTA, the County presented the testimony of Linda Clark, a commercial valuation specialist with the County Appraiser's office. Clark testified that she had taken numerous courses over the years from the International Association of Assessing Officers, the Appraisal Institute, and the Property Valuation Division (PVD) of the Kansas Department of Revenue. She also stated that she currently held a certified assessment evaluator designation from the International Association of Assessing Officers, a general certified appraisal certificate from the Kansas Real Estate Appraisal Board, that she was a registered mass appraiser with the PVD, and that she was current in her continuing education classes. Based on this education and training, COTA determined Clark was qualified to give an opinion as to the value of the KenTacoHut.

Clark noted that when a taxpayer appeals the assessment of his or her property, she will review the previous work done in making the initial assessment, request further information, and then make a value determination. Clark testified that the County's original assessment of $1,774,450 was calculated using a cost approach to value within a computer assisted mass appraisal (CAMA) system approved by the PVD director of the Kansas Department of Revenue. The specific cost approach system used in the County's CAMA system was the Marshall & Swift cost valuation system, a nationally known cost system and one of the most widely used by appraisers. Clark said that the cost parameters used in the Marshall & Swift system to value the KenTacoHut were specific for 2008.

Clark reported that she personally inspected the KenTacoHut on February 11, 2010. She noted the KenTacoHut was located on a "pad site" and that the building, considering its age (built in 1989), was in good condition and well maintained. When she inspected the property, she determined the County incorrectly had listed the total building area of the KenTacoHut as 6,124 square

feet. Instead, the square footage of the restaurant was 6,222. Because the cost approach was used in 2008 to value the KenTacoHut, the increase in square footage resulted in an increase to the estimated value of the restaurant from $1,774,450 to $1,778,660. Clark specifically stated that the increase in the estimated value was solely the result of the discovery of the additional 98 square feet in 2010. She denied doing an entirely new cost approach to estimate the value of the KenTacoHut.

For purposes of the hearing, Clark prepared a 75-page document (introduced into evidence and designated as Exhibit 1), which included the report from the CAMA system assigning a $1,778,600 value to the KenTacoHut for the 2008 tax year. Specifically, the report indicated that it would cost $1,136,250 to replace the KenTacoHut building. A 10 percent "entrepreneurial profit" was added to this cost, resulting in a total replacement cost of $1,249,880. Clark stated that, based on her training and experience, adding a 10 percent entrepreneurial profit to the replacement cost was appropriate.

Once the replacement cost is calculated, Clark said that the age, physical condition, and functional utility of a building are considered to determine the applicable percentage of depreciation for the building. Here, the Marshall & Swift system—based on the building's quality, type, and age—applied a 38 percent decrease to the replacement cost, resulting in a value of $774,920. Next, Clark noted that no market adjustment (an adjustment that affects a particular property but cannot be explained in the land value or elsewhere, *e.g.*, "functional obsolescence") or economic adjustment (an external economic force that is having a positive or negative impact on the property) was made to the value of the KenTacoHut. Clark believed the KenTacoHut did not suffer from functional obsolescence because she could see no justification for changing the use of the property. The property appeared to be viable in its current, operational format. Based on her inspection of the property, she also did not believe an economic adjustment was warranted.

Clark then explained that she also considered the replacement cost for 25,430 square feet of asphalt and 2,220 square feet of concrete surrounding the KenTacoHut in determining the prop-

erty's value using the cost approach. Clark accounted for the replacement value of these items (a total of $33,160 after depreciation) and added this amount to the $774,920. Finally, Clark considered the 60,662 square feet of land upon which the Ken-TacoHut sits, which was valued at $16 per square foot and resulted in a total value of $970,590.

In determining whether $16 per square foot was a reasonable price for the land, Clark said she looked at sales of land she believed were similar based on their size, zoning, sale dates, locations, and whether they were considered "pad sites." Based on this criteria, Clark chose four land sales between 2006 and 2007 that ranged in sale price between $13 and $24.02 per square foot. The list of comparable land sales was included in Exhibit 1. After looking at these sales, Clark concluded there was sufficient support for a $16 per-square-foot value to the land.

Adding together the cost value of the building, the asphalt, the concrete, and the value of the land, the total value of the Ken-TacoHut property came to $1,778,660.

In addition to the report from the CAMA system using the Marshall & Swift cost-approach system, Exhibit 1 also included other documentation intended by Clark to support the reasonableness of a $1,778,660 value for the KenTacoHut. First, Clark looked at 2008 values assessed by the County for numerous fast-food restaurants and determined that the value assigned to the KenTacoHut was within the range of these values. The list of fast-food restaurants was included in Exhibit 1.

Second, Clark performed an income approach to estimate the KenTacoHut's value using the County's CAMA system and data for restaurant rental, expense, and capitalization rates in 2008. Using this approach, Clark estimated the income value of the KenTacoHut at $2,192,000. Clark calculated this estimate only to provide support for the reasonableness of the value estimated by using the cost approach. Clark further noted that the $2,192,000 was not selected as the assessment value because, at the time of the original valuation, the County lacked sufficient income and expense data to perform a reliable income approach using the CAMA system.

Although Clark did not perform a sales-comparison approach to estimate the KenTacoHut's value, she considered sales of comparable properties to again verify the reasonableness of the County's assessment. She noted that the County does not have a sales-comparison approach for mass appraisals that is PVD approved. Regardless, Clark understood that under K.S.A. 2011 Supp. 79-503a, she was required to consider sales of comparable properties to determine the validity of the County's assessment of the KenTacoHut. Clark included a list of these sales in Exhibit 1 so others reading the report could come to their own conclusions regarding the reasonableness of the value assigned to the subject property.

Clark looked at seven sales, four of which were submitted by Privitera. Clark did not consider two of these sales—the sale of a Long John Silver's for $380,000 and the sale of a Taco Bell for $507,000—as suitable comparisons because she believed they were not typical "arm's-length transactions." Specifically, she noted that the Long John Silver's sale was a "sale-leaseback transaction" and the sale of the Taco Bell was not an open market sale. Based on her review of the other sales of properties she believed were comparable to the KenTacoHut, she was confident the County's assessment was reasonable.

Clark said that she believed the cost approach utilized by the County to value the KenTacoHut was the most appropriate because that was the approach the County used to appraise a majority of the fast-food restaurants in 2008. Additionally, Clark said she was familiar with the factors listed in K.S.A. 2011 Supp. 79-503a to determine the fair market value of real property and that she considered all the factors listed in the statute to determine that the value assigned to the KenTacoHut by the County was appropriate.

Finally, Clark stated that she believed Standard 6 of the Uniform Standards of Professional Appraisal Practice (USPAP), issued by the Appraisal Standards Board, applied to Exhibit 1 and that the exhibit complied with the requirements of Standard 6. Notably, Clark said that when an assessment to an individual property is challenged, she must provide information specifically relating to the property so it can be determined whether the value assigned to the property—through the use of a mass appraisal system—was

reasonable. Clark did not believe Standards 1 and 2 of the USPAP applied to her work product because, in such a situation, she was not performing a complete appraisal of the property at issue.

Privitera did not present any evidence at the hearing before COTA.

After receiving briefs from the parties, COTA issued an order finding that

"the County's presentation—including its CAMA-generated mass appraisal report, supplemental documents, and testimony from a competent valuation expert—provides substantial competent evidential support for its original 2008 valuation. The Court also finds that the County's evidence, though far from perfect, meets minimum standards of reliability under Kansas law. Nothing in the record suggests that the County's value is premised on an appraisal approach expressly prohibited by USPAP. Nor is there any evidence of USPAP deviations that could be construed as materially detrimental to the County's overall opinion of value.

"Based on the record taken as a whole—and in view of the failure of proof on the part of [Privitera]—the Court finds in favor of the County."

Accordingly, COTA reinstated the County's original value of $1,774,450 for the KenTacoHut for the 2008 tax year. After COTA denied Privitera's petition for reconsideration, Privitera filed a timely petition for judicial review in this court.

ANALYSIS

Before reaching the substantive challenge to COTA's valuation of the property, we must address Privitera's preliminary argument that COTA erred in concluding that Privitera, not the County, bore the burden of proof at trial.

I. *Burden of Proof*

Privitera's burden of proof argument requires this court to interpret K.S.A. 2011 Supp. 79-1609. Accordingly, we exercises unlimited review. *In re Tax Appeal of Graceland College Center*, 40 Kan. App. 2d 665, 668, 195 P.3d 248 (2008), *rev. denied* 289 Kan. 1278 (2009). To the extent that COTA's decision regarding which party had the burden of proof at trial resulted from a finding of fact, however, we review that decision to see if it is supported by

substantial evidence when viewed in light of the record as a whole. See K.S.A. 2011 Supp. 77-621(c)(7).

K.S.A. 2011 Supp. 79-1609 states in pertinent part:

"Any person aggrieved by any order of the hearing officer or panel may appeal to [COTA] by filing a written notice of appeal . . . . A county or district appraiser may appeal to [COTA] from any order of the hearing officer or panel. With regard to any matter properly submitted to [COTA] relating to the determination of valuation of residential property or real property used for commercial and industrial purposes for taxation purposes, it shall be the duty of the county appraiser to initiate the production of evidence to demonstrate, by a preponderance of the evidence, the validity and correctness of such determination *except that no such duty shall accrue with regard to leased commercial and industrial property unless the property owner has furnished to the county or district appraiser a complete income and expense statement for the property for the three years next preceding the year of appeal.* No presumption shall exist in favor of the county appraiser with respect to the validity and correctness of such determination." (Emphasis added.)

The clear and unambiguous language of the statute indicates that if the property at issue is leased commercial property and the owner failed to furnish "to the county or district appraiser a complete income and expense statement for the property for the three years next preceding the year of appeal," then the owner bears the burden of proof before COTA to show that the tax assessment for the property was inaccurate. This interpretation is further supported by K.S.A. 2011 Supp. 74-2433f(d), which states that "[f]inal decisions of the small claims and expedited hearings division [of COTA] may be appealed to [COTA]. An appeal of a decision of the small claims and expedited hearings division to [COTA] *shall be de novo.*" (Emphasis added.) Thus, even if an owner of leased commercial property is successful in challenging the tax assessment before the small claims and expedited hearings division of COTA (as was the case here), the owner will bear the burden on appeal before COTA if the owner failed to provide the county or district appraiser with the information required under K.S.A. 2011 Supp. 79-1609.

Here, there is no dispute that the property at issue constitutes leased, commercial property. Thus, if Privitera wanted to shift the burden of proof to the County, it had the duty to provide the

County with "a complete income and expense statement for the property for the three years next preceding the year of appeal." See K.S.A. 2011 Supp. 79-1609. Although Privitera failed to provide a formal income and expense statement to the County, Privitera did provide the County with a copy of the lease for the KenTacoHut showing the amount of money Privitera received in rent and showing that the tenant was responsible for paying expenses. Privitera argued before COTA that the copy of the lease satisfied the requirement for producing an income and expense statement in order to shift the burden of the proof to the County. COTA disagreed, finding the lease did not constitute an income and expense statement as contemplated by the legislature when drafting K.S.A. 2011 Supp. 79-1609. Thus, COTA held the evidentiary burden remained on Privitera to show the invalidity of the tax assessment on the KenTacoHut. Despite this conclusion, COTA went on to review the County's evidence and ultimately determined that it constituted substantial evidence supporting the original assessment of $1,774,450.

In support of its argument regarding burden of proof, Privitera challenges COTA's finding that the lease did not constitute an income and expense statement as contemplated by the legislature when drafting K.S.A. 2011 Supp. 79-1609. But Privitera has failed to include a copy of the lease in the record on appeal. Thus, we have no way of determining whether COTA was correct when it determined that the lease was insufficient to constitute an income and expense statement. See *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 283, 225 P.3d 707 (2010) (The burden is on the party making a claim to designate facts in the record to support that claim; without such a record, the claim of error fails.). Because Clark testified before COTA that Privitera failed to provide a complete income and expense statement for the KenTacoHut, substantial evidence supports COTA's decision that the burden of proof remained on Privitera at the hearing. Having resolved the burden of proof issue, we move on to Privitera's argument alleging COTA's valuation of $1,774,450 for ad valorem tax purposes was not supported by valid or otherwise substantial evidence.

## II. *COTA's Valuation*

As noted above, the only evidence presented at the hearing before COTA regarding the value of the KenTacoHut was the testimony of Clark and Exhibit 1, the document she prepared for COTA's consideration. Nevertheless, Privitera contends COTA should not have relied on this evidence to determine the value of the KenTacoHut because: (1) Clark's report did not comply with Standards 1 and 2 of the USPAP; (2) her report did not contain a "highest and best use analysis" as required by the USPAP; (3) Clark should have noted in her report that she received assistance from counsel with writing specific sections of her report; (4) Clark should have explained in her report why a 10 percent upward adjustment was added to the replacement cost of the building; (5) Clark's testimony at trial indicated that she lacked the knowledge to testify competently about a cost approach to value; (6) contrary to Clark's opinion, the distinct characteristics of the KenTacoHut indicated that the property had functional obsolescence that should have been accounted for when valuing it; (7) Clark's testimony at trial indicated that she only considered comparable sales which supported the County's assessment; and (8) the validity of the income approach to value that Clark included in her report was questionable because it contained information that Clark merely copied from other sources.

### A. *Standard of Review*

The Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.*, defines the scope of judicial review of state agency actions unless the agency is specifically exempted by statute. K.S.A. 2011 Supp. 77-603(a); *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 906, 249 P.3d 434 (2011). COTA orders are subject to KJRA review. K.S.A. 2011 Supp. 74-2426(c). Relevant to the facts presented here, the court may grant relief to the party challenging COTA's decision if such party sustains its burden to prove the invalidity of the agency action in one or more of the following manners: (1) COTA has erroneously interpreted or applied the law (K.S.A. 2011 Supp. 77-621[c][4]); (2) COTA has engaged in an unlawful procedure or has failed to follow prescribed procedure

(K.S.A. 2011 Supp. 77-621[c][5]); (3) COTA's decision was based on a determination of fact, made or implied, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole (K.S.A. 2011 Supp. 77-621[c][7], [d]); or (4) COTA's decision is otherwise unreasonable, arbitrary, or capricious (K.S.A. 2011 Supp. 77-621[c][8]).

"Substantial evidence is that which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. [Citation omitted.]" *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 459, 124 P.3d 57 (2005). When determining whether a factual finding is supported by substantial evidence when viewed in the light of the record as a whole,

"the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record . . . cited by any party that supports such finding, including determinations of veracity by the presiding officer . . . ." K.S.A. 2011 Supp. 77-621(d).

This court, however, does not reweigh the evidence or engage in de novo review. K.S.A. 2011 Supp. 77-621(d). If COTA's decision is not supported by substantial evidence, it may be viewed as arbitrary or capricious. *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d 329, 333, 102 P.3d 1176 (2004), *rev. denied* 279 Kan. 1006 (2005).

Finally, to the extent that Privitera's appeal of COTA's decision requires statutory interpretation, this court exercises unlimited review. *In re Tax Appeal of Graceland College Center*, 40 Kan. App. 2d at 668. We note Kansas appellate courts no longer give deference to an agency's interpretation of a statute and, therefore, have unlimited review. *Saylor v. Westar Energy, Inc.*, 292 Kan. 610, 614, 256 P.3d 828 (2011); *In re Tax Exemption Application of Kouri Place*, 44 Kan. App. 2d 467, 471, 239 P.3d 96 (2010).

B. *Applicable Law*

There are several Kansas statutes that explain the process used to calculate property taxes. K.S.A. 79-501 requires that each parcel

of real property be appraised for taxation purposes to determine its fair market value. In turn, K.S.A. 2011 Supp. 79-503a defines "fair market value" as "the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." The statute also states:

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

"(a) The proper classification of lands and improvements;

"(b) the size thereof;

"(c) the effect of location on value;

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

"(e) cost of reproduction of improvements;

"(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

"(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

"(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes." K.S.A. 2011 Supp. 79-503a.

## K.S.A. 2011 Supp. 79-503a concludes with the following:

"The appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal

procedures which are adaptable to mass appraisal and consistent with the definition of fair market value unless otherwise specified by law."

The factors listed in K.S.A. 2011 Supp. 79-503a set forth the three approaches to establishing value: " 'the sales approach, the cost approach and the income approach. All appraisers must consider and apply the three approaches to value in order to determine the fair market value of property when data to perform each approach is readily available.' " See *Wagner v. State*, 46 Kan. App. 2d 858, 861-62, 265 P.3d 577 (2011) (quoting from PVD Directive No. 98-033 and noting that directives from the PVD "are considered administrative rules or regulations, which have the force and effect of law"), *rev. denied* 294 Kan. 948 (2012).

K.S.A. 79-505(a), which gives the PVD the right to adopt appraisal directives, states that appraisals performed in connection with ad valorem taxation in this state must be in writing. K.S.A. 79-505(a)(2). K.S.A. 79-504(b) establishes that appraisals produced by the CAMA system prescribed or approved by the PVD shall be deemed to be written appraisals that fulfill the statutory requirements. Furthermore, K.S.A. 79-505 and K.S.A. 79-506 require that appraisal practice be governed by the USPAP (1992). *Board of Saline County Comm'rs v. Jensen*, 32 Kan. App. 2d 730, Syl. ¶ 4, 88 P.3d 242, *rev. denied* 278 Kan. 843 (2004). The USPAP standards "are embodied in the statutory scheme of valuation, and a failure by [COTA] to adhere to them may constitute a deviation from a prescribed procedure or an error of law." *Jensen*, 32 Kan. App. 2d at 735.

The PVD issued Directive No. 92-006 in November 1992, which requires county appraisers to perform all appraisal functions in conformity with Standards 2 and 6 of the USPAP (1992). Standard 2 governs the form and content of an appraisal report that communicates the result of a single real-property appraisal performed under Standard 1. USPAP Standard 2, pp. 15-18 (1992). Standard 1 governs the substantive aspects of developing a competent, single real-property appraisal. USPAP, Standard 1, pp. 9-13 (1992). In comparison, USPAP Standard 6, pp. 29-36 (1992), establishes the guidelines which should be observed when performing and re-

porting a mass appraisal (*i.e.*, "the process of valuing a universe of properties as of a given date utilizing standard methodology, employing common data, and allowing for statistical testing," USPAP, Definitions, p. 8 [1992]). See *In re Tax Appeal of Yellow Freight System, Inc.*, 36 Kan. App. 2d 210, 214, 137 P.3d 1051, *rev. denied* 282 Kan. 790 (2006); *Haynes v. Hixon*, No. 96,096, 2006 WL 3257477, at *3 (Kan. App. 2006) (unpublished opinion), *rev. denied* 283 Kan. 930 (2007); Att'y Gen. Op. No. 96-71, pp. 5-6. The prefatory comment to Standard 6 recognizes that "[m]ass appraisals are used primarily for purposes of ad valorem taxation," that they can be "prepared with or without computer assistance and are often developed by teams of people." USPAP, p. 29 (1992).

The USPAP includes a departure provision. This provision "permits limited exceptions to sections of the [USPAP] that are classified as specific guidelines rather than binding requirements." USPAP, Departure, p. 5 (1992). Furthermore, the USPAP includes a jurisdiction exception rule that states: "If any part of these standards is contrary to the law or public policy of any jurisdiction, only that part shall be void and of no force or effect in that jurisdiction." USPAP, Jurisdiction, p. 6 (1992).

### C. *Privitera's Assertions of Error*

1. *Was Clark's report invalid because it did not comply with Standards 1 and 2 of the USPAP?*

Privitera contends the appraisal method used by Clark to produce her report does not comply with USPAP Standards 1 and 2, which presents the proper procedure for performing and reporting an individual appraisal.

As we noted above, USPAP Standard 1 controls the development of individual appraisals, Standard 2 controls the reporting of individual appraisals, and Standard 6 controls both the development and reporting of mass appraisals. See USPAP, pp. 9, 15, 29; *In re Tax Appeal of Yellow Freight System, Inc.*, 36 Kan. App. 2d at 214. In a May 1996 letter to the Douglas County Appraiser (quoted in Att'y Gen. Op. No. 96-71), the PVD explained the application of Standards 2 and 6 in connection with appraisals completed for ad valorem tax purposes:

" 'USPAP Standard 6 covers mass appraisals. Generally speaking, this is the standard that the county appraiser is required to adhere to in doing appraisals for ad valorem tax purposes. USPAP Standard 2, however, covers "single property appraisals." "Single property appraisals" include those appraisals used to value special purpose properties that do not lend themselves to mass appraisal techniques.

" 'USPAP Standard 6 also applies to those properties that have been initially valued through mass appraisal techniques, but whose values have been reexamined as a result of the hearing and appeals process.

" 'It has never been the Division's intention to require the county appraiser to meet both USPAP Standard 2 and 6 on each and every appraisal conducted for ad valorem tax purposes. Either USPAP Standard 6 is applicable (mass appraisals), or USPAP Standard 2 is applicable (single property appraisals), but not both.' " Att'y Gen. Op. No. 96-71, pp. 3-4.

In this case, Privitera does not deny the County's initial valuation was based on the mass appraisal process. Instead, it argues that once Clark examined the property and adjusted the initial valuation, the process was no longer one of a mass appraisal but instead automatically became an appraisal of one individual property. In support of this argument, Privitera relies on the following question and answer in the illustration appended to an advisory opinion promulgated in the 2008-2009 edition of the USPAP, Advisory Opinion 32:

"3. An assessment appeal is in process, and an appraisal of an individual property is being conducted as part of that appeal. Which development standards apply?

"STANDARD 1 . . . would apply because an individual property is being appraised rather than a universe of properties." USPAP, p. A-114, Illus. 3, (2008-2009 ed.).

We are not persuaded by Privitera's argument. This is because there is no evidence that Clark utilized any individual site-specific data in compiling her report that was not utilized in the initial mass appraisal process. In evaluating the reasonableness of a $1,778,660 value for the KenTacoHut, the record reflects that Clark reviewed the previous work done in making the initial assessment, personally inspected the property to confirm the accuracy of the data used in the initial assessment (and corrected an error in square footage as a result), and verified the factual basis supporting the $16 per-square-foot value to the land used in the initial assessment.

In addition to the report from the CAMA system using the Marshall & Swift cost-approach system, Clark looked at 2008 values assessed by the County for numerous fast-food restaurants and determined that the value assigned to the KenTacoHut was within the range of these values. Of course, this type of inquiry is entirely consistent with a mass appraisal approach to assessment. Although the record also reflects that Clark performed an income approach to estimate the KenTacoHut's value, she utilized the County's mass appraisal CAMA system for the data regarding the universe of restaurant rental, expense, and capitalization rates in 2008.

Simply put, there is no evidence to suggest that Clark performed a complete, a partial, or a supplemental appraisal for the property at issue here. When a mass appraisal assessment to an individual property is challenged, the County must provide information specifically relating to the property in order to determine whether the value assigned to the property—through the use of a mass appraisal system—was reasonable. Providing such information does not automatically transform a mass appraisal, which must conform to Standard 6, to an individual appraisal, which must conform to Standards 1 and 2.

*2. Were Clark's report and testimony invalid because her report did not contain a "highest and best use analysis" as required by the USPAP?*

Next, Privitera argues that Clark's report and testimony were not sufficient to establish a value of the KenTacoHut because she did not do a "highest and best use analysis" of the property to determine whether there was actually a market for a building housing three separate fast-food restaurants. Privitera argues that Standard 6 of the USPAP requires a highest and best use analysis be done in a mass appraisal.

Standard 6-2(h), a specific guideline which an appraiser can depart from, states:

"In developing a mass appraisal, an appraiser must observe the following specific appraisal guidelines:

. . . .

"(h) in appraising real property, consider the effect on use and value of the following factors: existing land-use regulations, reasonably probable modifications

of such regulations, economic supply and demand, the physical adaptability of the property, neighborhood trends, and the highest and best use of the property." USPAP, pp. 30-31 (1992).

The comment to Standard 6-2(h) states in pertinent part that "[i]n considering highest and best use, an appraiser should develop the concept to the extent required for a proper solution of the appraisal problem." USPAP, p. 31 (1992).

Standard 6-7(i) states: "Each written report of a mass appraisal for any purpose other than for ad valorem taxation, and, when provided, a written summary report of a mass appraisal for ad valorem taxation must: . . . (i) in the case of real property, discuss how highest and best use was determined." USPAP, p. 35-36 (1992). The comment to Standard 6-7(i) states that a "mass appraisal summary report should reference case law, statute or public policy that describes highest and best use requirements." USPAP, p. 36 (1992).

In her report addressing highest and best use, Clark stated: "The highest and best use of a property may change over time if the character of the neighborhood changes creating demand for a different use. As there is no evidence of such a change, the current use is considered the highest and best use." In support of this statement, Clark cited *Board of Douglas County Comm'rs v. Cashatt*, 23 Kan. App. 2d 532, 534-36, 545, 933 P.2d 167 (1997), a case where a panel of this court approved of a county taking into consideration the changing nature of property (residential to commercial) surrounding the taxpayer's property (a residence located on 40,627 square feet of land) in order to determine the fair market value of the property for ad valorem tax purposes. Furthermore, Clark noted in her report that she was invoking the USPAP's departure rule for Standard 6-2(h) as well as the USPAP's jurisdictional exception rule to 6-7, citing K.S.A. 79-504 in support (stating that "[a]ppraisals produced by the [CAMA] system prescribed or approved by the director of property valuation shall be deemed to be written appraisals for the purposes of this act").

At the hearing, Clark conceded that she did not do a highest and best use analysis because it would be cost prohibitive to attempt to do that type of analysis on each property subject to a mass ap-

praisal. Clark testified that unless there is a claim from the taxpayer or elsewhere that the use of a property will change at some point in the near future, the County assumes that the present use of the property is the highest and best use. She further stated that she had no reason to believe that the present use of the KenTacoHut was not its highest and best use.

Notably, Clark's testimony concerning whether the present use of the KenTacoHut was its highest and best use is substantially similar to testimony given by an appraiser in *In re Tax Appeal of Yellow Freight System, Inc.* In that case, an appraiser testified regarding the value assigned to the taxpayer's corporate headquarters using a CAMA system. The appraiser testified that "he did not do a highest and best use analysis; however, he testified that 'the highest and best use is the current use unless we have reason to believe or data to support a difference.'" 36 Kan. App. 2d at 217. Furthermore, the appraiser testified that "'[t]here was no reason to believe that its current use wasn't the highest and best use. There is no market information to indicate otherwise . . . . [T]here was nothing about the property in its appearance or anything from the owners that would indicate otherwise.'" 36 Kan. App. 2d at 217-18. The panel concluded that based on USPAP Standard 6-2(h) and the comment to that standard, the appraiser's testimony fit within the criteria for determining highest and best use and constituted substantial evidence addressing that issue. 36 Kan. App. 2d at 218-19.

Based on *Cashatt* and *In re Tax Appeal of Yellow Freight System, Inc.*, we find Clark's report and testimony sufficiently addressed the issue of highest and best use, and Privitera failed to present any evidence before COTA to suggest otherwise.

   3. *Was Clark's report rendered invalid because she failed to note in her report that she received assistance from counsel in writing specific sections of her report?*

Privitera asserts that at the hearing Clark said she received assistance from counsel in properly wording some of the items found in her report—specifically, statutes cited in the sections of the report addressing highest and best use, performance testing and

measurements obtained, and certification. Privitera argues that because counsel assisted in preparing the report, "counsel's name should have been included in the report as one contributing significant assistance." In support of this contention, Privitera cites USPAP Standard 6-8.

Standard 6-8 states that each written mass appraisal completed "for purposes other than ad valorem taxation" must have a signed certification form which contains several statements that the appraiser endorses to the best of his or her knowledge and belief. One such statement is that "no one provided significant professional assistance to the person signing this report. (If there are exceptions, the name of each individual providing significant professional assistance must be stated.)" USPAP, p. 36 (1992).

Based on the clear language of Standard 6-8, Clark was not required to include counsel's name within the report as a person contributing significant assistance. Even if she was, we note that, in the certification section of her report, Clark invoked the USPAP's jurisdictional exception rule to Standard 6-8 by citing K.S.A. 79-504 and K.S.A. 79-1466 as the statutes controlling the sufficiency of her report.

*4. Was Clark's report rendered invalid because she failed to explain in her report why a 10 percent upward adjustment was added to the replacement cost of the KenTacoHut?*

Privitera argues that Clark's report violated USPAP Standard 6-7 because the report failed to explain why, in employing the cost approach to determine the KenTacoHut's value, a 10 percent upward adjustment was added to the replacement cost of the building.

During her testimony at trial, Clark explained that when calculating the replacement cost of the KenTacoHut, a 10 percent "entrepreneurial profit" was added to the estimate, resulting in a total replacement cost of $1,249,880. Based on her education and training, Clark said it was appropriate to add a 10 percent entrepreneurial profit when using a cost approach to value.

On cross-examination, Clark conceded that there was no information contained in the report to justify the 10 percent increase.

Clark agreed with Privitera's counsel's statement that in order for the report not to be misleading, Clark would have to accompany the report and explain why a 10 percent increase was made to the replacement cost of the KenTacoHut. Clark noted, however, that the report documenting how the cost value of the KenTacoHut was calculated came from the CAMA system approved by the PVD and used by the County. Clark stated that the PVD was made aware that the reports generated by the CAMA system lacked information concerning the justification for the 10 percent increase and that subsequent changes had been made to address this issue.

Standard 6-7 lists the information that must be contained in either a written summary report of a mass appraisal for ad valorem taxation or a written report of a mass appraisal for any other purpose. USPAP, p. 34-36 (1992). As already noted, Clark invoked the USPAP's jurisdictional exception rule to Standard 6-7, citing in support K.S.A. 79-504. Because Clark testified that the CAMA system used by the County to determine the value of the KenTacoHut was approved by the PVD, the appraisal report generated from the system was sufficient under Kansas law. See *In re Tax Appeal of Yellow Freight System, Inc.*, 36 Kan. App. 2d at 217 (noting CAMA appraisal produced by county and admitted into evidence satisfied the statutory definition of a "written appraisal" under K.S.A. 79-504[b]). Furthermore, any confusion that was created by the lack of information contained in the report concerning the 10 percent increase was alleviated by Clark's testimony at trial.

  5. *Did Clark's testimony at trial indicate that she lacked knowledge to testify competently about the cost approach utilized to value the KenTacoHut?*

Privitera asserts Clark was unable to state at trial what the economic life was for the KenTacoHut or the surrounding site improvements (asphalt and concrete). Privitera argues that this lack of knowledge by Clark demonstrates she is incompetent.

Privitera's argument would have more credence if Clark conducted a single-property appraisal of the KenTacoHut using a cost approach to estimate the value. If such an approach was used, then Clark would need to know the specific economic life for the build-

ing and the surrounding site improvements. But Clark did not conduct a single-property appraisal of the KenTacoHut. She verified the accuracy of the KenTacoHut's tax assessment which resulted from the County's CAMA system using a Marshall & Swift cost system. Clark's testimony and Exhibit 1 clearly indicate that the Marshall & Swift system applies a depreciation percentage to the replacement costs for a building and surrounding site improvements based on their type, quality, and age. Accordingly, because the system is a mass-appraisal system, the percentage of depreciation actually applied to a particular building and surrounding site improvements is an estimate. As indicated by counsel's questions to Clark on cross-examination, the only way to test the accuracy of the amount of depreciation applied to a particular property using the Marshall & Swift system would be to perform an individual calculation of the property's economic life. Notably, Privitera did not present any evidence at trial to indicate or suggest that the amount of depreciation that the Marshall & Swift system applied to the KenTacoHut was inaccurate. Thus, we find that Privitera's argument concerning Clark's competence is without merit.

> 6. *Did the evidence establish that the KenTacoHut suffered from functional obsolescence that should have been accounted for when determining its value using the cost approach?*

Privitera argues Clark's conclusion that the KenTacoHut did not suffer from functional obsolescence (and, thus, no downward adjustment should be made to its value) was invalid due to the KenTacoHut being the only one of its kind in Johnson County and larger than most fast-food restaurants in the county. But Privitera did not present any evidence to COTA to suggest that these facts established that the KenTacoHut suffered from functional obsolescence. The only evidence that COTA had to consider in resolving this issue was Clark's testimony. At trial, Clark stated that she concluded that the KenTacoHut did not suffer from functional obsolescence because she could not see any justification for changing the use of the property. Specifically, Clark said that the property appeared to be viable in its current, operational format (*i.e.*, three fast-food restaurants in one). Furthermore, Clark said that

she could not justify making an adjustment to the KenTacoHut's value based on its size because there was no objective data available to support such an adjustment. Accordingly, Privitera's argument concerning functional obsolescence lacks merit.

*7. Was Clark's opinion concerning comparable sales invalid because she allegedly only considered sales which supported the County's assessment?*

Privitera argues that Clark only considered sales of restaurants that supported the value the County assigned to the KenTacoHut.

As noted above, Clark did not perform a sales-comparison approach to estimate the KenTacoHut's value. To that end, she testified the County does not have a sales-comparison approach for mass appraisals that is approved by the PVD. But Clark, based on the requirements of K.S.A. 2011 Supp. 79-503a, did consider sales of comparable properties to verify the reasonableness of the County's assessment of the KenTacoHut. Clark included a list of these sales in Exhibit 1 so others reading the report could come to their own conclusions regarding the reasonableness of the value assigned to the subject property.

Clark looked at seven sales, four of which were submitted by Privitera. Clark did not consider two of these sales—the sale of a Long John Silver's for $380,000 and the sale of a Taco Bell for $507,000—as suitable comparisons because she believed they were not typical "arm's-length transactions." Specifically, she noted that the Long John Silver's sale was a "sale-leaseback transaction" and the sale of the Taco Bell was not an open market sale. Based on her review of the other sales of properties she believed were comparable to the KenTacoHut, she believed that the County's assessment was reasonable.

Again, Privitera did not present any evidence to indicate that the sales Clark considered were inappropriate or skewed in favor of showing the reasonableness of the County's assessment of the KenTacoHut. Accordingly, we are not persuaded by Privitera's argument on this issue.

*8. Was the income approach to value that Clark employed in her report invalid because it contained information that Clark copied from other sources?*

Finally, Privitera argues that the income approach that Clark performed using the County's CAMA system was invalid because Clark merely input general 2008 data from the County for the restaurant industry into the CAMA system (*e.g.*, average income, average expenses, rental rates, vacancy rates, and capitalization rates). But the very definition of the mass appraisal method is "the process of valuing a universe of properties as of a given date utilizing standard methodology, employing common data, and allowing for statistical testing." USPAP, Definitions, p. 8 (1992). In order to estimate the value of the KenTacoHut for tax year 2008 using an income approach on the CAMA system, Clark necessarily would have to utilize statistical information that the County had regarding the restaurant industry in 2008. Privitera does not explain in its brief how Clark's decision to utilize this information was wrong or caused her resulting estimate of the KenTacoHut to be inaccurate. Nor did Privitera present any evidence to COTA to show that Clark's income approach to value estimate was invalid. Privitera's argument is without merit.

In sum, we have reviewed Clark's testimony and Exhibit 1—the only evidence presented to COTA in conjunction with this case—and find substantial evidence supports COTA's decision to reinstate the County's original 2008 assessment of $1,774,450 for the KenTacoHut.

Affirmed.