NOT DESIGNATED FOR PUBLICATION

No. 113,692

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE MATTER OF THE EQUALIZATION APPEAL OF
ARC SWEET LIFE ROSEHILL, L.L.C.,
FOR THE YEAR 2013 IN JOHNSON COUNTY, KANSAS

MEMORANDUM OPINION

Appeal from the Board of Tax Appeals. Opinion filed July 15, 2016. Affirmed.

*Kathryn D. Myers*, assistant county counselor, for appellant.

*Darcy Demetre Hill*, of Property Tax Law Group, LLC, of Overland Park, for appellee.

Before MCANANY, P.J., PIERRON and SCHROEDER, JJ.

MCANANY, J.:  The Johnson County Board of County Commissioners (County) appeals from the ruling by the Kansas Board of Tax Appeals (BOTA) reducing for the 2013 tax year the ad valorem valuation of the real property located at 12802 Johnson Drive, Shawnee. The Sweet Life Rosehill senior living facility is located on the property. The property is owned by ARC Sweet Life Rosehill, L.L.C. (Taxpayer). The Taxpayer holds the property in fee simple and is an affiliate of Brookdale Senior Living of Brentwood, Tennessee, the largest owner/operator of senior living communities in the United States.

The property consists of two parcels totaling 5.8 acres. The parties both valued the property as one economic unit. The facility located on the property was constructed in two phases in 2003 and 2005. It consists of a combination of assisted living and skilled

1

nursing care units and beds for a total of 148 separate units. Of the 148 beds, 44 are for assisted living and 104 are for residents needing skilled nursing care. In 2012 the facility was 86% occupied, which was consistent with its recent occupancy history. The parties stipulate that highest and best use of the property is as a senior living facility.

For the 2013 tax year, the County appraised the property at a total valuation of $11,882,090. The Taxpayer sought review by BOTA under K.S.A. 2015 Supp. 79-1609. BOTA conducted an evidentiary hearing. The County presented testimony from its in-house expert appraiser, Perry Bailey, and its retained appraisal expert, Bernie Shaner. The taxpayer presented the testimony of its retained appraisal expert, Michael Boehm. Following that hearing, BOTA determined that Boehm's appraisal was the best indicator of value and reduced the value of the property to $9,250,000. The County's appeal brings the matter to us.

On appeal, the County contends that BOTA erred in adopting the taxpayer's appraisal because: (1) the appraisal violated Kansas law by allowing a hypothetical condition of "as if vacant" to be considered for the purpose of valuation; (2) the appraisal violated Kansas law because it was based on an extraordinary assumption; and (3) the taxpayer's expert's going concern methodology violated accepted appraisal practice. But because the County has failed to meet its burden of proof as the appellant on these issues, we affirm BOTA's decision.

*BOTA Proceedings*

The parties stipulated before BOTA that the property is residential. The County had the evidentiary burden to show the validity and correctness of its valuation of the property. See K.S.A. 2015 Supp. 79-1609.

2

The parties stipulated to the admission of "all our exhibits." The only exhibits identified were the reports of the three appraisal witnesses. The reports of the County's principal appraisal witness and of the Taxpayer's expert were admitted into evidence. The report of the County's rebuttal expert was identified but never admitted into evidence.

The County requested that BOTA adopt its updated cost approach valuation of $11,207,160 for the property. The Taxpayer requested that BOTA adopt its expert's valuation of $9,250,000.

*Perry Bailey*

Perry Bailey testified for the County. He is a registered mass appraiser employed in the commercial department of the county appraiser's office. He prepared the County's valuation, which was based on a cost approach to value, that was prepared using the Orion System of the Kansas Division of Property Valuation. After inspecting the property in December 2013, he prepared a computer-assisted mass appraisal report with supporting documentation which valued the property in fee simple as of January 1, 2013.

In appraising the property Bailey rejected the comparable sales approach and the income approach and, instead, relied solely on the cost approach to value. The cost approach estimates the fair market value of the land, plus the direct and indirect replacement cost (new) of the improvements, plus entrepreneurial profit for the builder, and less accrued depreciation from all causes.

According to Bailey, "the Kansas PVD [Property Valuation Division] has not approved the sales comparison approach." Bailey testified that the cost approach is the only way to value a special-use property of this nature. He ran across a New Jersey case which held that "cost would be the appropriate way to value these types of properties."

3

Bailey did not identify the case by name, date, or citation. In his view, the cost approach is the only way to value this type of property "and still adhere to mass appraisal techniques and adhere to the standards under USPAP [Uniform Standards of Professional Appraisal Practice] Standard 6" because there are too many variables associated with evaluating senior living facilities using the comparable sales approach. Besides, according to Bailey there is a lack of market data needed to perform a meaningful sales comparison. Bailey concluded that the cost approach is the most probative because it isolates the value of the land and the bricks and mortar that make up the improvements.

With respect to the Taxpayer's attempt to separate the business value of the senior living center from the underlying real estate, Bailey's "position is that it would be almost impossible, especially . . . using mass appraisal techniques under USPAP Standard 6 to extract the business value from the real estate value." He explained further on cross-examination that he did not think "this county or any county" could separate the value of the business from the underlying real estate because counties doing a mass appraisal do not have the tools to do it and still adhere to USPAP Standard 6.

Bailey testified that the property is a special-use property and that generally "there's lots of business value associated with this type of property" and, more specifically, "this property." But the determination of the business value to be extracted from the real estate must be based on market data. In Bailey's view, there is no market data that an appraiser could use to isolate the value of the business from the real estate.

Bailey did not perform an income approach in determining the fair market value of the property. He conceded that a prospective buyer of the property would not rely on the cost approach to value but would look to the overall business value of the property.

4

*Michael Boehm*

The Taxpayer's expert, Michael Boehm, prepared a full narrative appraisal report on the property. Boehm is a member of the Appraisal Institute (MAI) and holds the Counselor of Real Estate (CRE) designation. He is the founder and president of Senior Living Valuation Services, Inc., a real estate firm that specializes in appraising senior housing properties. Since 1993 Boehm's appraisal firm has published a national service of capitalization rates for senior housing based on actual sales of senior living facilities and based on the responses to questionnaires sent to appraisers, brokers, and banks. He was a practicing CPA before forming his present company in 1991. Boehm has extensive commercial appraisal experience and has appraised about 1,600 senior living facilities nationwide, including a few dozen senior living facilities in Kansas. About 80 percent of his appraisals are of properties held by banks as loan collateral.

As part of his appraisal analysis, Boehm surveyed the local senior housing market, including both assisted living facilities and nursing homes. As of January 1, 2013, the facility located on the property had an occupancy rate of 89%. Boehm's appraisal states it is in compliance with USPAP.

Boehm explained his appraisal process. First, he estimates the going-concern value of the senior living facility. "The going concern is the sum of the real estate value, the personal property value, and the business or intangible value."

> "So through using the cost approach, the income approach and the sales comparison approach, I estimate the going-concern value of the subject. But that's not the purpose of this assignment. The purpose of this assignment is to get down to the fair market value of the real estate only. So then I have to do an allocation of my going concern conclusion to the individual components."

5

In this appraisal Boehm did valuation calculations using all three approaches to value but relied on the income approach in the final analysis. "[T]he way buyers and sellers evaluate and purchase and sell properties like this is through cash flow because this is primarily an income-producing business. And buyers and sellers would base their purchase on how much cash flow or money this property would make."

Boehm rejected the cost approach because "buyers and sellers do not use the cost approach when they sell, you know, ten-plus-year old retirement communities. So if buyers and sellers don't use it, it's really not possible for a cost approach analysis to be a reliable indicator of fair market value." He rejected the comparable sales approach because overall the market for senior housing is illiquid and "[t]he differences in the properties that do sell are so great that it's difficult to reliably adjust those differences to the subject." Boehm considered the comparable sales approach a rather "soft" indicator of value and "more of a parameter check on the income approach."

Using the three approaches to value, Boehm determined that the going concern value of the property (which includes the real estate, the personal property, and the business or intangible components) was $14,350,000 using the cost approach; $13,500,000 using the income approach; and a range of $10,500,000 to $14,600,000 using the sales approach. Reconciling these approaches, Boehm determined that the fair market value of the going concern was $13,500,000.

To tease out the business/intangible element of the going concern and thereby arrive at the fair market value of the underlying real estate alone, Boehm valued the property "as if it was hypothetically vacant" and compared it to the value of the subject as if it was effectively full. "[T]he difference in those two values is the intangible value."

6

"[T]he value on the day that it opens is only real estate value because none of the intangibles have been created yet. There's no staff there, there's no senior residents there, there's no established relationships with doctors and hospitals. All those pieces that comprise business value intangibles have not been created on the day that the property opens. And therefore, if I can make a reliable estimate on the day that the property opens, I can get to a calculation of the difference between that number and the as-is number [which] gives me the value of the intangibles which I can then subtract from the going concern. Then what I'm left with is the market value of the real estate only."

Using this methodology, Boehm estimated that the full operating business value was $13,500,000, and the value of the subject "as if vacant" was $10,000,000. The difference between the two numbers is the intangible business value of $3,500,000. From the "as if vacant" value of $10,000,000, he deducted the depreciated personal property component of $750,000 to arrive at a fair market value of $9,250,000 for the real property. The going concern valuation comprised about 25% of the total value of the property. The balance was attributable to the underlying real estate (70%) and personal property (5%). According to Boehm, these values were consistent with those he had observed at other senior housing properties.

On cross-examination, Boehm acknowledged that the intangible value of a going concern such as the taxpayer's senior living center is not easily quantified because it is not traded separate and apart from the underlying real estate and is not separately valued by the parties in a sales transaction. Nevertheless, according to Boehm the intangible going concern has value which he can value using his appraisal judgment, a method which he believes is in compliance with USPAP standards.

Boehm testified that this business value calculation is a widely accepted appraisal methodology for the purpose of estimating the business or intangible value of a property. He has used this methodology to isolate the business/intangible value of properties since

the 1980s in thousands of appraisals he has done. He acknowledged this methodology is not mentioned in *The Appraisal of Real Estate*, 14th Edition, but he explained that the method appears in other appraisal literature, and it involves "a complication that goes beyond what that book can get to." Boehm stated that he believed there was a consensus in the appraisal profession as to how to calculate a "going concern," but there might not be a consensus on allocation. Boehm testified that his methodology is accepted by all of his clients, and his clients accept only USPAP-compliant appraisal reports.

*Bernie Shaner*

Bernie Shaner, MAI, Senior Residential Appraiser (SRA), testified as the County's rebuttal witness. Shaner is an expert in multifamily residential properties and in condemnation matters. He had completed 30 to 50 appraisals of senior housing facilities.

The County relied on the cost approach for its opinion regarding the value of the subject property, but Shaner did not. He rejected the cost approach as the sole indicator of value because relying solely on the cost approach would not comply with accepted appraisal practices. He considered all three approaches to value.

Shaner undertook a sales comparison approach, but because there were few sales of comparable properties, the available sales data were insufficient for valuation purposes.

Shaner relied on the income approach to value the property and used the direct capitalization method, though he acknowledged that the discounted cash flow method used by Boehm was a generally accepted appraisal method.

8

Contrary to Bailey's view that "there's lots of business value associated with this type of property," Shaner concluded that because of external obsolescence the property did not have any business value to deduct in order to arrive at a valuation of the property. According to Shaner, the external obsolescence arose from the fact that the property produces too little income to support the real property, leaving nothing left to be considered business value. After deducting the value of personal property but nothing for the value of the business conducted on the premises, Shaner arrived at a property valuation of $13,016,000.

*BOTA's Decision*

BOTA issued a summary decision in which it found the value for the property determined by Boehm to be the best indicator of value. The County requested a full and complete opinion under K.S.A. 2015 Supp. 74-2426(a).

In its complete opinion that followed, BOTA recounted the testimony of the three appraisal witnesses. It noted the County's burden "to demonstrate, by a preponderance of the evidence, the validity and correctness of its valuation determination." BOTA defined the task at hand as follows:

> "Each parcel of non-agricultural real property in Kansas is appraised at its fair market value. *See* K.S.A. 79-501. The term 'fair market value' is defined as that 'amount in terms of money that a well-informed buyer is justified in paying and a well-informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion.' *See* K.S.A. 2014 Supp. 79-503a."

BOTA noted that the County relied on a mass appraisal cost approach "based on the theory that the market value of an improved parcel can be estimated as the sum of the

9

land value and the depreciated value of the improvements' construction costs." Boehm, on the other hand, relied primarily on the income approach. BOTA found that Boehm initially determined "the going concern or the business enterprise value, which is the market value of the real property, personal property, and the intangible assets of the business." BOTA further found:

> "[T]he subject property is such a property where the real property and business operating therein are integrally related. 'It may be difficult to separate the market value of the land and the building from the total value of the business, but such a division of the realty and non-realty components of value may be required by the intended user of the appraisal.'" *The Appraisal of Real Estate*, Appraisal Institute 30 (13th ed. 2008).

BOTA concluded that Boehm's appraisal was "more comprehensive, more exhaustive, and specifically pertinent to the valuation of the subject senior living facility." BOTA found that "Boehm relied on an industry-wide accepted methodology to segregate the subject facility's business/intangible value from the subject real property value." On the other hand, BOTA found that the County's cost approach "was generic and not as specific to the property under review." Further, the cost approach "with no additional analysis to address possible business/intangible value, [is] of limited probative value for properties such as the subject property wherein the real property and the business operating therein are so closely dependent."

BOTA found that Boehm "demonstrated a high level of acumen in both the operation and appraisal of senior living facilities." Further, Boehm "demonstrated an unparalleled command of both the senior housing facilities market and the appraisal mechanics for the accurate valuation." BOTA reduced the 2013 appraised value of the property to $9,250,000.

The County did not petition BOTA for reconsideration as permitted by K.S.A. 2015 Supp. 74-2426(b), but rather filed its petition for judicial review in accordance with K.S.A. 2015 Supp. 74-2426(c)(4)(A).

*Standards of Review*

We are at somewhat of a disadvantage in considering this matter because the County did not file a petition for reconsideration, which, since 2014, it is no longer required to do as a prerequisite to judicial review. See K.S.A. 2015 Supp. 74-2426(c)(4)(A). Nevertheless, an appellant is still required to raise an issue before the tribunal below in order to preserve the issue for appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011); *In re Equalization Appeal of Krueger*, No. 113,038, 2015 WL 7434715, at *4 (Kan. App. 2015) (unpublished opinion), *petition for rev. filed* December 14, 2015.

BOTA was similarly at a disadvantage in deciding the case. While the County had the right to move BOTA to reconsider its decision before this appeal, the County did not do so, thereby depriving BOTA of the opportunity to revisit its opinion in light of the County's specific objections and criticisms and possibly avoid the necessity of judicial review. See *Kansas Industrial Consumers v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 332, 338, 42 P.3d 110 (2002).

The only testimony presented to BOTA was from the County's staff appraiser, its rebuttal expert appraiser, and the Taxpayer's expert appraiser. The only documentary evidence admitted at the hearing consisted of the County's exhibit 1, its appraiser's report, and the Taxpayer's exhibit 1, which apparently is its appraiser's report. The appraisal report of the County's rebuttal expert, Bernie Shaner, was marked for identification as "County's Rebuttal Number 2," but it was never offered or received into evidence. But

11

BOTA's final order refers to "Shaner's rebuttal appraisal" so BOTA apparently considered it though it was not formally admitted.

No trial briefs were submitted to BOTA in advance of the hearing. The parties waived both opening statements and closing arguments. No suggested findings of fact and conclusions of law were submitted to BOTA after the hearing. Now on appeal, the County appends to its brief 209 pages of extracts from *The Appraisal of Real Estate*, 14th ed.; extracts from *The Uniform Standards of Accepted Appraisal Practice*; two unpublished opinions from our court; four other BOTA decisions relating to the cost approach to value; and six opinions from various appraisal boards and courts relating to the appraisal method purportedly used by the Taxpayer's expert in this case. In its appellate brief, the County cites six published cases on substantive issues from Kansas, Connecticut, Iowa, and Minnesota. None of these materials was presented to BOTA for consideration in deciding this case.

Now, on appeal, the County raises arguments and claims that were never presented to BOTA to consider. The shotgun list of issues identified in the pretrial order does not save the County from the fact that many of these issues were not addressed at the hearing, and BOTA had no way of determining whether they were still at issue. As noted earlier, issues not raised below cannot be raised on appeal. *Wolfe Electric*, 293 Kan. at 403. There are three specific exceptions to this rule, but the County does not seek to invoke any of them.

Our task is not to conduct a de novo examination of the fair market value of this senior living center for ad valorem tax purposes. To the contrary, our task in reviewing BOTA's decision is to determine whether in deciding this matter BOTA violated any of the provisions specifically set forth in K.S.A. 2015 Supp. 77-621(c)(1) through (8). This

12

statute is part of the Kansas Judicial Review Act (KJRA), K.S.A. 2015 Supp. 77-601 *et seq.*, which defines the scope of judicial review of state agency actions.

Pursuant to K.S.A. 2015 Supp. 74-2426(c), BOTA is an agency subject to KJRA review. As noted earlier, the County bore the burden of proof before BOTA under K.S.A. 2015 Supp. 79-1609. On appeal, the County continues to bear the burden of proof because as the appellant it has the burden to prove the invalidity of BOTA's decision. K.S.A. 2015 Supp. 77-621(a)(1); *Golden Rule Ins. Co. v. Tomlinson*, 300 Kan. 944, 953, 335 P.3d 1178 (2014).

In our review we construe tax statutes strictly in favor of the taxpayer. *In re Tax Appeal of LaFarge Midwest*, 293 Kan. 1039, 1045, 271 P.3d 732 (2012). The interpretation of a statute is a question of law over which we have unlimited review. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009). In that regard, we consider our role as an appellate court to be that of a body *reviewing* a matter that first came before the administrative agency, not to consider legal issues not presented to the agency before the appeal. Further, in reviewing Kansas statutes, we no longer defer to the agency's interpretation. See *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013); *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs*, 290 Kan. 446, Syl. ¶ 2, 228 P.3d 403 (2010); *In re Tax Exemption Application of Kouri Place*, 44 Kan. App. 2d 467, 472, 239 P.3d 96 (2010). But, of course, this principle does not come into play if the agency did not interpret a Kansas statute.

K.SA. 2015 Supp. 77-621(c) sets out eight standards under which we may grant relief. The County does not specifically refer to the statute, but its statement of issues suggest that it is relying on K.S.A. 2015 Supp. 77-621(c)(4), (c)(7), and (c)(8) to support its argument that relief should be granted.

13

K.S.A. 2015 Supp. 77-621(c)(4) requires us to grant relief if BOTA erroneously interpreted or applied the law.

K.S.A. 2015 Supp. 77-621(c)(7) provides for relief if BOTA's decision was based on a fact that is not supported by evidence that is substantial when viewed in the light of the record as a whole. "[I]n light of the record as a whole" includes evidence both supporting and detracting from an agency's finding. K.S.A. 77-621(d). To be substantial competent evidence, the evidence must provide a substantial basis in fact from which the issues can be reasonably determined. *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 709, 216 P.3d 170 (2009). In considering the sufficiency of the evidence, we are specifically instructed:  "In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

K.S.A. 2015 Supp. 77-621(c)(8) requires us to grant relief if BOTA's action is otherwise unreasonable, arbitrary, or capricious.

*The County's Contentions*

The thrust of the County's appeal is as follows:  The cost approach is the only proper method for appraising a property such as this. Boehm did not rely on the cost approach. Further, in arriving at the value of the property he improperly considered the hypothetical condition of the property being vacant and tried to hide this fact in his report. Thus, Boehm's appraisal did not meet USPAP standards, and BOTA erred in relying on Boehm's appraisal to determine the value of the property for ad valorem tax purposes.

14

The County raises this basic complaint in a number of iterations throughout its brief. Though the arguments are often somewhat repetitive, we will attempt to consider each seriatim in the following analysis. In doing so, we will subsume the various supporting arguments into the three principal contentions in the County's brief: (A) Kansas law does not allow for a hypothetical condition to be imposed on the subject property for the purpose of determining the property's value for *ad valorem* tax purposes; (B) Boehm's opinion of value is based on an "extraordinary assumption" for which there is no reasonable basis in fact; and (C) Boehm's "going concern" methodology is not accepted appraisal practice.

*A. No error in considering a hypothetical condition.*

The County claims BOTA erred in adopting Boehm's method of including the hypothetical condition of the property being vacant in reaching his valuation of the property. The County apparently is relying on K.S.A. 2015 Supp. 77-621(c)(4) because the County argues BOTA erroneously interpreted or applied the law.

When valuing property for tax purposes, Kansas law requires valuation of the fee simple interest, which is defined as "'[a]bsolute ownership unencumbered by another interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.' The Appraisal of Real Estate, p. 114 (13th ed. 2008)." *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 130, 275 P.3d 56 (2012). See *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d 329, 336-40, 102 P.3d 1176 (2004), *rev. denied* 279 Kan. 1006 (2005).

"Kansas tax statutes do not use the term 'fee simple'; however, it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has

15

always been to appraise the property as if in fee simple . . . K.S.A. 79-501 requires that each parcel of real property be appraised for taxation purposes to determine its fair market value." *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d at 130-31.

In determining the ad valorem valuation, Kansas law assumes the hypothetical condition of an assumed sale as of January 1 of the applicable tax year. K.S.A. 79-1455 states:  "Each year all taxable and exempt real and tangible personal property shall be appraised by the county appraiser at its fair market value as of January 1 in accordance with K.S.A. 79-503a." Fair market value as used in this statute is defined as follows:

> "'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. . . . For the purposes of this definition it will be assumed that consummation of a sale occurs as of January 1." K.S.A. 2015 Supp. 79-503a.

K.S.A. 2015 Supp. 79-503a also provides guidance on the factors that the County must consider in the valuation of real property. It provides:

> "Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:
>
>> (a) The proper classification of lands and improvements;
>>
>> (b) the size thereof;
>>
>> (c) the effect of location on value;
>>
>> (d) depreciation, including physical deterioration or functional, economic or
> social obsolescence;
>>
>> (e) cost of reproduction of improvements;
>>
>> (f) productivity taking into account all restrictions imposed by the state or federal
> government and local governing bodies, including, but not limited to, restrictions on

16

property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes." K.S.A. 2015 Supp. 79-503a.

The County contends that K.S.A. 2015 Supp. 79-503a permits as a hypothetical condition the hypothetical sale of the property on January 1 of the tax year, but not that the property is hypothetically vacant. But the language of the statute clearly notes that the list is nonexclusive. The County provides no additional statutory or case law to support its position that Kansas law prohibits the appraiser from employing a hypothetical condition to reach its determination of value. Although there is a reference to "hypothetical conditions" in the BOTA decision that was appealed in *In re Yellow Equipment & Terminals, Inc.*, No. 107,653, 2012 WL 6634418, at *8 (Kan. App. 2012) (unpublished opinion), which we will discuss later in this opinion, there was no discussion of the use of such an approach by our court in considering the appeal. Thus, we do not presume that a hypothetical condition may not be used in valuation merely

17

because it was not included in the list. See *State v. Martin*, 285 Kan. 735, 741-42, 175 P.3d 832 (2008).

As the County argues, K.S.A. 2015 Supp. 79-505 and K.S.A. 79-506 require that appraisal practice be governed by USPAP, which is issued by the Appraisal Standards Board. See *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d 881, 890, 221 P.3d 598 (2009). These standards are embodied in the statutory scheme of valuation. A failure to adhere to USPAP standards may constitute a deviation from a prescribed procedure or an error of law. *In re Appeal of Brocato*, 46 Kan. App. 2d 722, 727, 277 P.3d 1135 (2011).

USPAP recognizes the use of hypothetical conditions. USPAP defines a hypothetical condition as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis." USPAP, Definitions, p. U-3. But the County claims that Boehm violated USPAP standards by not clearly disclosing the fact that he used a hypothetical condition to value the property "as if vacant." The County complains that this fact did not appear until page 120 of his report. The County does not provide any authority that mandates where the hypothetical condition must be disclosed or how it must be disclosed, just that it must be disclosed "clearly and conspicuously."

USPAP permits the use of hypothetical conditions, but they must be clearly identified in the appraisal. The appraiser must:

"(g) identify any hypothetical conditions necessary in the assignment; . . .
    "<u>Comment</u>:  A hypothetical condition may be used in an assignment only if:
- use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison;
- use of the hypothetical condition results in a credible analysis; and

18

- the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions." USPAP, Standards Rule 1-1(g), p. U-18.

Further, USPAP requires that an appraiser:

"Clearly and conspicuously:
- state all extraordinary assumptions and hypothetical conditions; and
- state that their use might have affected the assignment results." USPAP, Standards 2-2(a)(xi), p. U-24.

The disclosure of the hypothetical condition "as if vacant" appears in Boehm's appraisal report in the section entitled "Allocation of Total Going Concern Value to Components" under the heading "Business/Intangible Component Valuation." Boehm's report states:

"The business/intangible component of the subject value reflects the fact that the subject is a business requiring specialized management services such as meals, housekeeping, living assistance, health care and social activities which represent complications in the operation of a senior housing facility and require specific managerial expertise. An appropriate and widely industry accepted method to estimate the business value component is to compare the total going concern value of the subject's ongoing cash flow stream as estimated earlier in this report, as of January 1, 2013 ($13,500,000) to its estimated value *as if it were hypothetically empty* at January 1, 2013 as estimated on the following page ($10,000,000) and using market supported information and appraisal judgments as discussed and supported throughout this report.

"On the exact date that the subject is physically completed but vacant, only real estate value exists—no business value has yet been created. The estimated business value would be the difference in these values or $3,500,000 ($13,500,000 less $10,000,000) as of January 1, 2013." (Emphasis added.)

19

On the next page of the report appears a chart, which clearly discloses that it shows: "SWEET LIFE AT ROSEHILL VALUE AS IF HYPOTHETICALLY VACANT @ 1/1/13." In cross-examining Boehm at the hearing, the County referred to Boehm's use of this "as if vacant" hypothetical and confronted him with the assertion, "you say that clearly in your report." We conclude that Boehm's disclosure of this hypothetical condition was clearly made and was not fatally misplaced or hidden in his report.

Nevertheless, the County suggests that Boehm engaged in a subterfuge to mislead the tribunal about his "as if vacant" hypothetical. The County cites the Ethics Rule for Conduct that states that an appraiser "must not communicate assignment results with the intent to mislead or to defraud" and "must not use or communicate a report that is known by the appraiser to be misleading or fraudulent." USPAP, p. U-7. The County notes the scope of work rule, which requires that the appraiser provide sufficient information in the report "to allow intended users to understand the scope of work performed." USPAP, p. U-14. Finally, the County asserts that USPAP Standards Rule 1-1(b) prohibits an appraiser from committing a substantial error of omission that significantly affects an appraisal.

The only way the County seeks to pin this claim of unethical conduct on Boehm is by arguing that in his trial testimony Boehm was reluctant to admit that he used the hypothetical condition of "as if vacant" and only conceded the point when pressed during the County's cross-examination. But the record does not disclose an intent to hide this hypothetical condition. When responding to a question during direct examination about the scope of the assignment, Boehm explained at length about how he compared the value of the subject as if hypothetically vacant to its value when it is effectively full in order to determine the intangible value that should be excluded so as to arrive at the value of the underlying real estate.

20

As noted earlier, Boehm's testimony during the County's cross-examination belies the notion that the hypothetical vacancy of the property was somehow hidden. On cross-examination, Boehm explained:  "Well, we have a lot of market data about how to get to the going-concern number. And then I have a methodology that's market driven to help me isolate the business value number by comparing the value of the property as is to its value as if hypothetically vacant."

The County then asked Boehm about this "as if vacant" hypothetical:

"Q. . . .[Y]ou're assigning an as-if vacant to the real property, aren't you?

"A. No. I did that methodology to help me pry out the intangible part of the going concern.

"Q. Leaving an as-if vacant value for the real property. Your value of the real property is as-if vacant, *you say that clearly in your report.*

"A. Okay. It is a residual or as-if vacant.

"Q. But the property wasn't vacant on January 1 of 2013, was it?

"A. No. . . . My purpose was to estimate the market value of the real estate component only." (Emphasis added.)

On redirect examination, Boehm explained that valuing the property "as if vacant" is generally accepted appraisal methodology that he has used over 1,500 times. Boehm stated that his methodology of estimating the market value of the business value component of the total going concern is widely accepted as appropriate and reasonable.

Despite the County's assertions, we find no evidence in the record that Boehm intended to hide the fact or mislead anyone about this hypothetical condition he employed. The hypothetical condition was disclosed well into the report, but at that point in the report where the discussion of this hypothetical condition became relevant.

21

The County claims that Boehm stated in cross-examination that there was no hypothetical condition used in his report, but the record discloses no such assertion. In fact, the report clearly indicates that the method used in calculating the value of the included consideration of the "as if vacant" hypothetical condition. The County admitted this in questioning Boehm on cross-examination.

So far in its criticism of Boehm's use of a hypothetical condition the County has not demonstrated that Boehm violated Kansas law, violated USPAP, or how Boehm's specific use of the hypothetical condition in this case was in error.

Getting to the central issue of this appeal, the County cites three cases in an effort to drive a stake through the heart of the "as if vacant" theory Boehm used for valuation purposes. The County claims that the reviewing court concluded that valuing the occupied property "as if vacant" was inappropriate.

Two of the cases involved the same property but different tax years. In *In re Yellow Freight System, Inc.*, 36 Kan. App. 2d 210, 218, 137 P.3d 1051, *rev. denied* 282 Kan. 790 (2006), the property being evaluated was Yellow Freight's corporate headquarters. Moulder, the County's appraisal witness, did not do a highest and best use analysis of the property because he had no market information to suggest that the current use as a single tenant corporate headquarters was not the highest and best use. Yellow Freight's appraisal expert opined that the highest and best use of the property was as a multi-tenant office building, so he appraised the building under the assumption that it was vacant and available to tenants. BOTA found in favor of the County, and on appeal the district court reversed in favor of Yellow Freight's appraisal. The matter was then appealed to us. With no consideration of the "as if vacant" assumption of Yellow Freight's expert, a panel of this court reversed the district court, finding there was

22

substantial evidence in the form of Moulder's testimony to support BOTA's decision. 36 Kan. App. 2d at 217.

Because the Yellow Freight case turned on the issue of the highest and best use of the property being appraised, it is of no particular value in considering the issue now before us. There is no dispute in our present case that the property is now being put to its highest and best use.

In the second case, *In re Yellow Equipment & Terminals, Inc.*, No. 107,653, 2012 WL 6634418 (Kan. App. 2012) (unpublished opinion), the same corporate headquarters was the subject of the valuation dispute. The parties disagreed over the highest and best use of the property. The taxpayer contended that the Court of Tax Appeals (COTA) erred in not conducting a highest and best use analysis regarding YRC's corporate headquarters. YRC's appraisal expert testified that he was instructed by the bank compiling a portfolio of YRC properties to appraise the building as though it was vacant. This was with the expectation that if it were no longer YRC's corporate headquarters, the building could be leased out as a commercial multi-tenant office building. Under such a scenario, the taxpayer contended there would need to be a "lease-up discount" in the buildings valuation to account for the time and expense of acquiring tenants. 2012 WL 6634418, at *1. But COTA determined, and the court affirmed, that the highest and best use of the building was its existing use as a single-tenant or owner-occupied office building. Thus, the court concluded:  "In order for a lease-up discount to be a viable part of an appraisal, the highest and best use must involve leasing." 2012 WL 6634418, at *8.

There are obvious distinctions between this case and our current circumstances. There, the issue was a "lease-up discount." Here, the issue is the going concern value of the business operated on the taxable real estate. There, the issue turned on the highest and best use of the property. Here, the parties agree that the current use is the highest and best

23

use of the property. Boehm used the "as if vacant" component only to determine the intangible value of the business and how it related to the total valuation of this special use property dedicated to senior living.

The holdings in these two cases do not support the County's position that Boehm's methodology was flawed and contradictory to USPAP standards.

In the County's third cited case, *In re Mumbo Jumbo, L.L.C.*, No. 110,793, 2014 WL 4435905 (Kan. App. 2014) (unpublished opinion), the taxpayer appealed the determination of value without supporting its arguments. In a brief, five-paragraph opinion, this court summarily affirmed COTA's order under Supreme Court Rule 7.042(b)(3) and (5) (2015 Kan. Ct. R. Annot. 68.) The description of the claims involved in this appeal consists of two short paragraphs.

The County claims *Mumbo Jumbo* involved "the owner of a 100% occupied single tenant retail property who also put forth the same argument as in *Yellow2*." We find no support for this statement, other than the fact that the opinion refers to the property as being currently leased. We do not know whether multiple tenants or a single tenant were involved. The address of the property is noted in the opinion, but there is no indication of the nature of the property or its use. We do not know if the taxpayer was challenging the designation of its highest and best use. We do not have COTA's order that was summarily affirmed. We know too little about this case to attribute any value to it.

The County contends that BOTA erred in accepting an appraisal that valued the property "as if vacant" and economically unproductive. The County argues that the property's current use as a senior living facility, its agreed highest and best use,

24

"is only maximally productive when it is occupied. It is inherent that vacant improved property cannot be maximally productive.

"If the improvement is no longer financially feasible and that is why it is vacant, then the current use cannot be its H&BU. If the current use is the H&BU, but the property is vacant for a legitimate reason, and not by the owner's choice, such as a tenant vacates, then it is appropriate to apply a lease-up period to account for rent loss for such time as it is reasonable to expect the property to return to its maximum productivity."

This argument seems to miss the point. Boehm's analysis was not based on the premise that the senior living facility was, in fact, vacant either because it was no longer financially viable or because the seniors living there had all moved out for some other reason that would justify a "lease-up discount" such as proposed by the taxpayer in the second YRC case described above.

Boehm valued the underlying real property—the task at hand—by excluding the intangible value of the ongoing senior housing business being operated on the taxable property. The ultimate object of this exercise was to determine the true value of the real estate upon which to levy taxes and not to levy taxes based on the value of the business located on the real estate. Of course, whether this can be done is another matter, and we will address that further below. In any event, in order to isolate the going concern value from the underlying real estate Boehm sought to consider the property as it existed on its opening day, before it developed any value as a going concern. On that opening day, the property's highest and best use was as a senior living facility. Boehm's analysis did not undermine the agreement of the parties that the highest and best use of the property was its current use.

The County makes a conclusory statement that BOTA misapplied and misinterpreted Kansas law by adopting Boehm's valuation based on the County's

25

assertion: "In each of the above-cited appellate cases, BOTA dismissed the theory that fee simple means 'as if vacant' because it is contrary to Kansas law." In our review of these cases, as discussed above, we find no such sweeping conclusion. Besides, as we understand Boehm's analysis, he sought to determine the difference between the value of the property under a hypothetical vacant condition and its value as occupied in order to isolate the value of the taxable real estate separate and apart from the business being conducted on it.

So far the County has failed to show that Boehm's method was not a widely accepted appraisal method that did not comply with Kansas law or USPAP standards. Thus, the County has failed to show that BOTA acted unreasonably, arbitrarily, and capriciously in adopting Boehm's valuation of the property.

B. *No error in assuming the property had business value.*

For its second principal contention of error, the County contends that BOTA erred in adopting Boehm's appraisal because the appraisal is based on an extraordinary assumption of business value for which there is no reasonable basis in fact.

USPAP requires the appraiser to identify any extraordinary assumptions. See USPAP, p. U-18. Despite the County's assertions that Boehm should not have included business value in his appraisal, USPAP requires an appraiser to analyze personal property and business intangible value in appraisal assignments. USPAP Standard 1-4(g) states: "When . . . intangible items are included in the appraisal, the appraiser must analyze the effect on value of such non-real property items.

The County's argues that

"Boehm's reasoning as to the existence of 'business value' is an extraordinary assumption based on circular reasoning:

- The Subject is a special purpose property because it is designed to meet the specialized needs of an elderly population.
- Because it is a special purpose property, only a business owner who specializes in providing care to the elderly would buy or lease the real property.
- Because the owner specializes in providing care to the elderly, the owner also must provide specialized services.
- Therefore, the owner incurs start-up costs to acquire a license to provide care, hire and train a workforce, and advertise and market its product to entice residents and develop relationships with doctors and hospitals.
- Without incurring these start-up costs, the services cannot be provided.
- If the services cannot be provided, residents will not move into the facility.
- Thus, the facility has only a residual value as a vacant building, after deducting start-up costs and the depreciated costs of the FF&E."

The County's theory on circular reasoning is not supported by testimony, by citations to the transcript, by citations to Boehm's appraisal, or by citations to BOTA's decision. As the party asserting the invalidity, the County has the burden of showing the invalidity of BOTA's action. *Golden Rule Ins.*, 300 Kan. at 953. Further, as discussed at length earlier in this opinion, the County misstates the basis for Boehm's "as if vacant" analysis. It is not to undermine or minimize the value of the property, but to isolate the value of the going concern from the underlying real estate.

Rather than providing evidence in the record to support this claim, this portion of the County's argument is dedicated to a reassertion of its position that the cost approach is the only proper valuation method. In other words, why get into extraordinary assumptions

of business value if the cost approach is the only viable method for appraising this property? But the cost approach was considered and rejected by Boehm, Shaner, and BOTA as unreliable in this case.

Shaner, the County's rebuttal expert appraiser, rejected the cost approach as the sole indicator of value because relying solely on it would not comply with accepted appraisal practices. On the contrary, he considered all three approaches to value.

BOTA concluded: "[T]he Board further finds a cost approach, with no additional analysis to address possible business/intangible value, of limited probative value for properties such as the subject property wherein the real property and the business operating therein are so closely dependent." BOTA also noted that Boehm rejected the cost approach because it is generally not used to determine the market value of a 10-year-old senior housing facility.

The County cites the text "The Appraisal of Real Estate" for its contention that the cost approach is a reliable method for developing market value. Being a reliable method does not equate with being the sole appropriate method. The County's citation to this text does not disprove BOTA's conclusion that it was not reliable in this specific case.

The County also refers us to four recent BOTA decisions regarding Johnson County real estate in which the cost approach to value was approved. The first case, *In the Matter of the Equalization Appeal of Robo Car Wash, L.L.C. for the year 2009 in Johnson County, Kansas*, No. 2009-8317-EQ, involved a car wash in Olathe. Both parties relied on the cost approach to value. The County did not perform an income approach because income and expense data were not available. Such was not the case before us. Both Boehm and Shaner had sufficient income and expense data to develop an income approach to value.

28

*In the Matter of the Equalization Appeal of Greggpiercy, Inc. for the year 2013 in Johnson County, Kansas*, No. 2013-3053-EQ, involved another car wash, this one in Overland Park. The County used the cost approach, and the taxpayer used the income approach. BOTA found that "the interest initially valued by [the taxpayer's appraisal expert] was that of the *going concern* or the *business enterprise value*, which is the market value of the real property, personal property, and the intangible assets of the business." No. 2013-3053-EQ, at *4. BOTA then cited *The Appraisal of Real Estate*, Appraisal Institute 29-30 (13th ed. 2008) for the proposition: "It may be difficult to separate the market value of the land and the building from the total value of the business, but such a division of the realty and non-realty components of value may be required by the intended user of the appraisal." But in the end, BOTA adopted the County's appraised value because the taxpayer could not justify its expense or capitalization rate, and there was no justification for a $500,000 deduction against the value of personal property. BOTA did not base its decision on a rejection of the business enterprise concept used by the taxpayer in our present case. All three members of BOTA that decided this car wash case participated in deciding our current appeal.

*In the Matter of the Equalization Appeal of Spirit Master Funding, L.L.C. for the year 2012 in Johnson County, Kansas*, No. 2012-5495-EQ, involved the Dickinson Palazzo 16 multiscreen movie theater in Overland Park. The property was initially appraised at $9.9 million. At the County's informal hearing this valuation was reduced to $9.4 million. The taxpayer appealed to COTA, seeking a further reduction to $6.2 million. The parties relied on the cost approach to value and arrived at similar values using that method. The primary dispute was over a $4 million functional obsolescence adjustment claimed by the taxpayer. Two BOTA members deciding our present case, James Cooper and Arlen Siegfried, heard the Dickinson Palazzo case. In that case they were not presented with the valuation approach used in our present case. Their conclusion

29

in the Dickinson Palazzo case that the cost approach was appropriate does not negate the validity of the approach used in the present case.

The final case, *In the Matter of the Equalization Appeal of Flik, Inc. for the year 2013 in Johnson County, Kansas*, No. 2013-3131-EQ, was decided by the same BOTA panel that decided our present case. The property at issue was another multiplex movie theater, the AMC Olathe 28. Again, the parties used the cost approach and arrived at roughly equivalent values. The dispute centered on the amount of functional obsolescence.

As we read them, none of these cases stands for the proposition that the income approach to value used by Boehm (and by the County's rebuttal expert) was improper.

The County also asserts that Boehm's appraisal is unreliable because of a mistake made by Boehm in using the cost approach. The County asserts that Boehm incorrectly deducted physical depreciation and functional obsolescence from the land value. This claimed error was never argued to BOTA. The County states: "Land is a non-wasting asset. It is improper to deduct depreciation from land value." The Taxpayer asserts that if the County had questioned Boehm on these issues at trial, he would have been given the opportunity to clarify his method of calculation. The County cites "The Appraisal of Real Estate," p. 569, for its proposition that the estimated market value of the land is added to the depreciated cost of the improvements.

The County directs us to Boehm's calculation of the cost approach in his appraisal report. There, Boehm calculated the total direct building costs, including land, at $21,694,259. From this he deducted depreciation of $7,344,168 to arrive at a net value using the cost approach of $14,350,000. We see nothing in this calculation that indicates that he depreciated the underlying real property in arriving at the total amount of

30

depreciation to be deducted from the total cost new. His depreciable items consisted of the physical building; the "FF&E" which we presume to mean the furniture, fixtures, and equipment; and "external obsolescence." This calculation does not identify the underlying real estate as part of what was being depreciated as "external obsolescence." In any event, we fail to see how his conclusion would be any different if he deducted the depreciation items unrelated to the underlying real estate before adding in the value of the land.

Further, there is no citation to Boehm's testimony or to his appraisal with specific reference to this claimed improper depreciation of the real estate. The County does not direct us to any testimony at trial from the County's experts regarding this asserted error. In fact, Boehm placed little, if any, reliance on the cost method of valuation. There may have been an error in Boehm's calculation, but the County fails to point to anything in the record to support this claim or to show what possible impact it had on Boehm's final valuation. Even if there is a mathematical error in Boehm's appraisal as adopted by BOTA, our courts have consistently held that while

> "a degree of clarity in agency factfinding and rationale is critical, agency determinations which are conceptually sound but lack mathematical precision may be affirmed. To find a lack of substantial evidence to support the BOTA action, the decision must be so wide of the mark to be outside the realm of fair debate." *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d 881, Syl. ¶ 5, 221 P.3d 598 (2009).

The County has not provided the asserted incorrect calculation in its brief. Nor has it shown that the claimed error resulted in a significant miscalculation of fair market value that would warrant reversal for being so wide of the mark that it is outside the realm of fair debate. Without such showings, the County has not met its burden of establishing reversible error.

31

Next, The County contends that BOTA did not engage in the four-part test provided in *In re Tax Appeal of Colorado Interstate Gas Co.*, 276 Kan. 672, 697-98, 79 P.3d 770 (2003), to determine if business value is a quantifiable intangible to be excluded. The County complains that BOTA assumed the existence of business value as an extraordinary assumption. But even Bailey, the County's principal expert, was of the opinion that "there's lots of business value associated with this type of property."

*Colorado Interstate Gas Co.* involved the valuation of public utility property. The question was whether BOTA erred when it taxed the gas company's intangible property, such as capitalized interest and overhead expenses. BOTA relied on the testimony of the Department of Revenue Property Valuation Division's (PVD) expert regarding a four-part test for defining intangibles which could be excluded in valuing the property. BOTA found that the gas company's claimed intangibles did not satisfy this test. Our Supreme Court did not adopt the test espoused by the PVD's expert, but merely concluded: "Given BOTA's status as a specialized agency acting within its area of expertise, we affirm BOTA's decision. 276 Kan. at 698. Since *Colorado Interstate Gas Co.* was decided, the statute has been changed and we no longer defer to the agency's expertise. *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013).

The County has not met its burden to show that BOTA erred in adopting Boehm's appraisal because it is based on an extraordinary assumption of business value.

C. *No error in adopting going concern methodology as an accepted appraisal practice.*

Finally, in another iteration of its oft-repeated claim, the County argues that BOTA erred by adopting Boehm's going concern methodology because it is not an accepted appraisal practice. The County claims that the cost approach is the only

32

accepted appraisal practice for valuing special purpose properties, properties that do not frequently trade in the open market, or properties that lack market data to develop an income approach. This, of course, was rejected by the County's own expert, Bernie Shaner.

The County cites "The Appraisal of Real Estate" for a description of the parsing income method; a method that attributes income to the various classes of assets. But the County does not contend, and certainly does not establish, that the parsing method is the only valid method for identifying and quantifying the intangible value associated with a property. Boehm conceded that he did not use the parsing method. But he testified that the parsing method was not the only generally accepted appraisal method to value a business value component. Boehm stated:  "The purpose of this assignment is to get down to the fair market value of the real estate only. So then I have to do an allocation of my going concern conclusion to the individual components."

The County argues that Boehm's job was to value the fee simple interest in real property, not the value of the going concern. It criticizes Boehm's identification of the scope of the assignment as follows:  "The purpose of this appraisal is to estimate the fair market value of the real estate component of the total fee simple going concern fair market value of the subject retirement community as of 1/1/13." The notion of fee simple title traditionally applies to real property and is not commonly used in relation to the ownership of a business interest. But Boehm's loose description of "the total fee simple going concern" value does not negate the process he used in separating the intangible value of the going concern from the underlying value of the real property. Nor does the task of valuing the real property underlying a commercial enterprise compel an exclusive reliance on the cost approach to value.

The County claims Boehm did not identify the income from the senior living center on the property derived from each component of the property (real property, personal property, and intangibles) and criticizes Boehm for not deducting the expenses attributable to each component to arrive at the net operating income of each component. But the County does not identify where in the testimony or in Boehm's valuation report this claimed error can be found. We cannot be expected to search the record for evidence to support such an assertion. The County does not assert that this criticism was brought to BOTA's attention. Boehm testified:  "The purpose of this assignment is to get down to the fair market value of the real estate only. So then I have to do an allocation of my going concern conclusion to the individual components." With nothing more, we do not presume that Boehm's allocation was either not done or not done properly.

The County also contends that Boehm did not develop a capitalization rate for each component to determine how each contributed to the valuation of the property. This may have something to do with the parsing income method, but we have addressed that issue earlier in this opinion.

For support, the County cites *Prieb* for the proposition that rental rates contained in or reflected by commercial build-to-suit leases do not reflect market conditions and cannot be used for purposes of the income approach or the sales approach. We fail to see what this has to do with the valuation of this senior living center, and the County provides little to no analysis to explain how this holding applies. A reading of *Prieb* does not reveal any helpful precedent for the present situation.

In what seems to be an unrelated argument, the County then asserts that Boehm double-dipped for the loss of revenue for vacancies, asserting that Boehm subtracted 24% for vacancy rates rather than the actual vacancy rate of 12%. The County provides no citation to the record as support for this assertion. Again, it is not this court's duty to

34

scour the 170-page hearing transcript and Boehm's 183-page appraisal to uncover support for the asserted double-dip error for which no meaningful citation to the record is provided. See *State v. Oliver*, 39 Kan. App. 2d 1045, 1050, 186 P.3d 1220 (2008), *rev. denied* 287 Kan. 768 (2009).

Finally, to support the proposition that Boehm's valuation procedure has been rejected as not credible, the County cites appellate court decisions in *Redding Life Care, L.L.C. v. Town of Redding*, 308 Conn. 87, 103-04, 61 A.3d 461 (2013); *Merle Hay Mall v. City of Des Moines Bd. of Review*, 564 N.W.2d 419, 423 (Iowa 1997); and *Eden Prairie Mall, LLC, v. County of Hennepin*, 797 N.W.2d 186 (Minn. 2011); along with *Chesapeake Hotel LP v. Saddle Brook Township*, 22 N.J. Tax 525 (2005), which involved a New Jersey hotel; the 2006 decision of the Maryland Tax Court involving a hotel in *RRI Acquisition Company, Inc. v. Supervisor of Assessments of Howard County*, No. 03-RP-OH-0055, 2006 WL 925212; the 2003 initial decision and order of an administrative judge of the Tennessee State Board of Equalization relating to a shopping mall in *Wolfehase Galleria, Ltd.*; the 2011 decision of the Maine State Board of Property Tax Review relating to a regional shopping mall in *GGP-Maine Mall, LLC v. City of South Portland*; *CP Hotels Real Estate Corporation v. Municipality of Jasper*, MGB 002/05 (2004), involving the Jasper Park Lodge and decided by the Municipal Government Board of Alberta, Canada; and *Fairmont Hotels v. Area 01*, the 2005 appeal of the assessment of the Fairmont Empress Hotel in Victoria, British Columbia, Canada.

We will not address all of these decisions. It appears that *Redding Life Care* is the only case involving a retirement community. In *Redding*, the Connecticut Supreme Court found that the trial court did not err in rejecting Boehm's appraisal based on flaws in his calculations, not because the going concern approach to valuation was improper as a matter of law. The court concluded:

35

"[T]he trial court's disagreement with the plaintiff's valuation turned on the flaws in Boehm's calculations and formula, not on the method itself. . . . Simply put, the trial court rejected Boehm's appraisal as not credible because it was premised on formulas and calculations that failed to value Meadow Ridge accurately. Thus, the trial court did not summarily dismiss the method as a matter of law." 308 Conn. at 103.

The Board in *Fairmont Hotels* noted the continuing debate among appraisers regarding the business enterprise approach and the fact that a majority have rejected this approach. In *CP Hotels Real Estate Corporation* the Board stated: "The business value approach taken by the Appellant was characterized as a controversial emerging theory— neither established nor proven, particularly in a Canadian context. Judicial reaction, including administrative tribunals, has been mixed. [Citations omitted.]" MGB 002/05, at *28. The Board in *Fairmont Hotels* found the business value approach used by the hotel owner's expert was not reliable. Similar criticism are found in other cases cited by the County. Some of these cases present some rather compelling arguments.

The problem is, none of these cases was cited to BOTA and none of these issues was argued to BOTA in our present case. None was asserted in a brief in advance of BOTA's hearing. None was asserted in an opening statement to the Board. None was addressed by either of the two experts who testified for the County. None was raised or argued in a closing argument. None was set forth in posthearing proposed findings of fact and conclusions of law. None was raised in a nonmandatory motion to reconsider. BOTA was never directed to these cases, nor was it apprised of the criticisms they advance. The County sets forth these criticisms for the first time in its appellate brief, and the County relies on these cases for the first time when it attached them to the Appendix to its appellate brief. In cross-examination of Boehm, the County touched on some of the criticism raised in these cases. But baking a cake involves more than merely buying the ingredients. The arguments raised in the cases and opinions in the Appendix to the

36

County's appellate brief were never argued to BOTA. Such a tactical decision may be appropriate in a garden-variety appeal of the valuation of a single family owner-occupied residence. But this is not that kind of case.

There is the possibility that explicitly raising these issues and arguing these authorities certainly could have resulted in a different decision by BOTA. But the County laid back in the weeds in the proceedings before BOTA and only now comes forward with these cases without ever having given BOTA an opportunity to consider them. Granted, our job is to review de novo matters of law. But we emphasize that the operative verb is review—not viewing and considering for the first time on appeal matters never brought before the Board. Our job is not to supplant the role of the Board by deciding appeals from decisions of local county tax appraisers. That is the job of the Board. Our task on appeal is to search the record to determine if BOTA committed errors of either fact or law which require our intervention. We can hardly say BOTA erred with respect to matters which were never presented to it.

As noted earlier, it is well established that issues not raised below cannot be raised on appeal. *Wolfe Electric*, 293 Kan. at 403. The County does not rely on any exception to this rule.

*Conclusion*

Based on the foregoing facts and analysis, we conclude that the County has failed to satisfy its burden of showing the invalidity of BOTA's decision. The County has not shown under K.S.A. 2015 Supp. 77-621(c)(4) that BOTA erred in finding that Boehm's going concern method complies with Kansas law. Nor has the County shown that BOTA based its decision on facts not supported in the record, as required under K.S.A. 2015 Supp. 77-621(c)(7). Finally, the County has failed to demonstrate that BOTA was

otherwise unreasonable, arbitrary, or capricious in its decision, as required by K.S.A. 2015 Supp. 77-621(c)(8).

Affirmed.