NOT DESIGNATED FOR PUBLICATION

No. 120,705

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeal of
RUFFIN WOODLANDS, L.L.C.,
for the Year 2017 in Wyandotte County, Kansas.

MEMORANDUM OPINION

Appeal from Board of Tax Appeals. Opinion filed July 2, 2020. Affirmed in part and dismissed in part.

*Wendy M. Green*, assistant counsel, of Unified Government of Wyandotte County/Kansas City, Kansas, for appellant.

*Kevin J. Breer* and *Kelli N. Breer*, of Breer Law Firm, LLC, of Westwood, for appellee Ruffin Woodlands, LLC.

*Dwight R. Carswell*, assistant solicitor general, *Toby Crouse*, solicitor general, and *Derek Schmidt*, attorney general, for amicus curiae State of Kansas.

Before HILL, P.J., BUSER and BRUNS, JJ.

PER CURIAM: Wyandotte County (the County) appeals the Kansas Board of Tax Appeals' (BOTA) decision valuing property owned by Ruffin Woodlands, L.L.C. (Ruffin) at $548,580 for the 2017 tax year. The County first contends that BOTA erred by: (1) finding that it failed to show whether it conducted a "thorough review of the subject property to determine the highest and best use" and (2) relying on the appraisal evidence presented by Ruffin. The County also argues that K.S.A. 74-2426(c)(4)(B) is unconstitutional because of its disparate treatment between a taxpayer's and a taxing authority's rights of appellate review. Upon our review, we find no error by BOTA and

hold that the County lacks standing to raise its constitutional claim. Accordingly, we affirm in part and dismiss in part.

FACTUAL AND PROCEDURAL BACKGROUND

Ruffin owns 380.9 acres of property in Wyandotte County known as the Woodlands. The Woodlands is a former dog and horse racing track containing grandstands, dog kennels, horse barns, and other ancillary buildings built in 1989 and 1990. The facility opened in 1989 and featured greyhound racing after the passage of the Kansas Parimutuel Racing Act (Racing Act), K.S.A. 74-8801 et seq. Horse racing was added the following year. The Woodlands was the first racetrack in Kansas regulated by the Kansas Racing and Gaming Commission and was the first legal gambling outlet operated in the Kansas City metropolitan area since the 1930s.

The Woodlands racetracks operated from 1989 until 2008. The Woodlands' annual handle—the total amount of money wagered—in dog and horse racing decreased dramatically during its operation. Between 1990 and 1997, the annual handle in dog racing dropped from $155.2 million to $20.4 million. During that same time, the annual handle in horse racing decreased from $42.2 million to $1.5 million. The decrease in the Woodlands' annual handle coincided with the opening of several casinos in the Kansas City area during the mid-1990s. In the last year that the Woodlands conducted dog and horse racing, the annual handle for each type of racing was $6.1 million and $1.3 million respectively. The Woodlands has remained vacant since it closed operations in 2008.

The Racing Act was enacted in 1987 and has not been repealed. This Racing Act allows organizations to receive a license to conduct horse and greyhound racing. K.S.A. 74-8813. The Racing Act also provides that applicants may receive (1) a facility owner license to own a racetrack facility designed for horse and greyhound racing and (2) a facility manager license to manage a racetrack facility. K.S.A. 74-8815(a) and (b).

2

Licensed organizations may conduct parimutuel wagering on horse and greyhound races at approved racetracks, as well as parimutuel wagering on simulcast horse or greyhound races. K.S.A. 74-8819.

In 2007, the Kansas Legislature enacted the Kansas Expanded Lottery Act (Lottery Act), K.S.A. 74-8733 et seq. This Lottery Act allowed for electronic gaming machines to be placed at parimutuel licensee locations. K.S.A. 74-8740. But before electronic gaming machines could be placed, the voters of a county were required to approve the placement of such machines in the county. K.S.A. 74-8743. The voters of Wyandotte County approved placement of electronic gaming machines in 2007.

Under the Lottery Act, the racetrack facility manager receives 25% of the net gaming machine income. K.S.A. 74-8747(a)(1). Forty percent of the net gaming machine income is allocated to the State's expanded lottery act revenues fund. K.S.A. 74-8747(a)(8). The other 35% of net income is allocated to certain funds, government entities, and gaming expenses. K.S.A. 74-8747(a)(2)-(7), (9). In contrast to the State's allotted 40% of gaming machine income from parimutuel racetracks, facility managers for State operated casinos are required to provide only 22% of the casino's gaming revenue to the State's expanded lottery act revenues fund. K.S.A. 74-8734(h)(12).

Following the enactment of the Lottery Act, legislation has been frequently introduced seeking to lower the State's allotment of gaming machine income from parimutuel racetracks and increase the income kept by the racetrack. For example, legislation was introduced in 2010 that proposed to reduce the State's allotment from 40% to 22% and increase the racetrack facility manager's distribution to 58% of the income. S.B. 401 (2010). However, this bill and other similar bills have been defeated.

In December 2015, Ruffin purchased the Woodlands for $15 million. At the time of purchase, Ruffin intended to renovate the property's improvements and operate a horse

3

racing facility with slot machines following the passage of favorable parimutuel racetrack gaming bills. Since purchasing the Woodlands, Ruffin has continued to support legislation that would increase the percentage of gaming machine income retained by racetrack facility managers. See, e.g., H.B. 2173 (2017); H.B. 2537 (2016). But, like similar legislation previously introduced, the bills died in committee.

The County retained Kevin Bradshaw to appraise the Woodlands for the 2017 tax year. Using a computer assisted mass appraisal (CAMA) system, Bradshaw valued the property at $7,025,690. Ruffin appealed this value to BOTA where the County had the evidentiary burden to show the validity and correctness of its valuation. See K.S.A. 79-1609. Ruffin retained Valbridge Property Advisors appraiser Bernie Shaner to appraise the property. Shaner valued the property at $540,000.

*The County's Appraisal Evidence*

At an evidentiary hearing before BOTA, Bradshaw testified that he valued the Woodlands at $7,025,690 by using the cost approach. The cost approach considers the value of the land plus the cost to reproduce the improvements minus the depreciation of the improvements.

In valuing the improvements on the Woodlands, Bradshaw considered that they had not been touched in 10 years. Bradshaw determined that the improvements were in disrepair and had limited value. As a result, Bradshaw applied an economic condition factor of 20%, meaning an 80% reduction in value was initially applied to the improvements. Bradshaw also applied a poor physical and functional rating to the buildings to account for depreciation. Using these adjustments, Bradshaw valued the buildings at $4,979,300. Bradshaw then determined the land had a value of $2,046,390 for a total property valuation of $7,025,690.

The County's valuation was based on Bradshaw's determination that the highest and best use of the Woodlands was its current use as a dog and horse racetrack. Bradshaw explained that under *In re Tax Appeal of Yellow Freight System, Inc.*, 36 Kan. App. 2d 210, 217-19, 137 P.3d 1051 (2006), the County assumes "the current use is [the] highest and best use unless there's reason to believe otherwise." Bradshaw believed that Ruffin intended to continue dog and horse racing because there was no evidence that the buildings were going to be removed. Bradshaw also noted that Ruffin employed a maintenance person to ensure that the improvements did not further deteriorate. However, Bradshaw did not analyze whether operating the Woodlands as a dog and horse racetrack would be financially feasible.

*Ruffin's Appraisal Evidence*

At the BOTA hearing, Shaner testified regarding the condition of the improvements designed for dog and horse racing. Like Bradshaw, Shaner determined the buildings were in poor condition. Shaner explained that the property was run down and the structures have deteriorated. Shaner noted many deficiencies with the property:

- All the buildings had original roofs, several of which were damaged and leaking.
- Both the horse racing and dog racing facilities had damaged roofs and there was mold contamination in both grandstand buildings.
- The ancillary buildings had exterior wood rot.
- All the buildings had peeling, fading, and/or discolored exterior paint.
- The metal railings and staircases had significant oxidation and rust.
- Several buildings had broken windows and damaged gutters.
- The asphalt and concrete paving used in the parking lots, roads, and sidewalks was cracked and deteriorated.
- The interior of the buildings contained spots of mold and were in poor repair.
- There was peeling vinyl tile from previous flooding.

5

- There was peeling paint on the ceiling and walls of the grandstand buildings.

- There was damaged drywall and acoustic ceiling tiles from roof leaks.

- The grandstand areas appeared to have been partially demolished before the Woodlands closed.

- The landscaping on the property was overgrown and unkempt.

- The plumbing and mechanical systems have been shut down for so long that problems will likely occur when restarted.

- The heating and cooling systems would likely need total replacement.

Shaner found that using the improvements to continue dog and horse racing was not the highest and best use of the property. Shaner noted that Ruffin purchased the Woodlands with plans to renovate it and reopen it as a horse racing track with slot machines. But Shaner determined that the required improvements to revive the current structures and convert them into a horseracing facility with slot machines would require "an unbelievable amount of renovation." As a result, Shaner concluded that using the Woodlands as a dog and horse racetrack was not physically feasible.

Shaner also determined that dog and horse racing was not a financially feasible use of the property. In reaching this conclusion, Shaner examined the historical and current state of dog and horse racing in Kansas and the United States. Shaner found that the popularity of dog and horse racing declined significantly during the 20th century, in part due to increased competition from casinos. As a result, horse and dog racing would not be financially feasible without supplemental income from slot machines. But slot machines could only make horse and dog racing financially feasible if the State's share of the income under the Lottery Act was reduced. And the Kansas Legislature had rejected recent attempts to reduce the State's share of gaming machine income at parimutuel racetracks. Therefore, Shaner concluded that:

6

"[b]ased on a combination of poor property condition, the decline of the greyhound and horse racing industries, and the continued failed passage of legislation that would reduce the state sales tax on slot machines at the subject [property] (from 40% to 22%), the existing improvements do not provide a legally permissible, physically possible, financially feasible, or maximally productive use."

Ultimately, Shaner determined that the highest and best use of the Woodlands was for residential development after removing the current structures. Shaner noted that the possible use as residential subdivision development would conform to the pattern of land use in the market area. After researching the issue, Shaner found that residential development would be financially feasible because the demand would be "sufficient to support construction costs and ensure the timely absorption of additional inventory in this market."

After finding that the highest and best use of the property was for demolition and single-family residential development, Shaner used a sales-comparison approach to determine that the market value of the Woodlands was $540,000 as of January 1, 2017. In calculating the market value, Shaner concluded that the value of the land was $2,970,000 based on comparable land sales. Shaner then subtracted the estimated cost of demolition—$2,430,000—to arrive at the $540,000 market value.

*BOTA's Decision*

BOTA agreed with Ruffin's evidence and ruled that the appraised value of the commercial portion of the property was $540,000. BOTA also found that an improvement on the residential portion of the property should be appraised at $8,580, for a total appraised value of $548,580. In reaching this valuation, BOTA found that Shaner's analysis was reasonable and agreed that residential development was the property's highest and best use. BOTA noted that "[t]he evidence does not indicate whether the [County] conducted a thorough review of the subject property to determine the highest

and best use. Instead, the [County] assumed that the current use is the highest and best use." BOTA rejected the County's highest and best use analysis, finding that "[t]he economic feasibility of horse and dog racing is questionable, and the existing structures have deteriorated to a condition that would be cost prohibitive to restore them."

BOTA also agreed with Shaner's higher appraisal of the land's value, finding that the comparable sales Shaner used were a better indicator of the Woodlands' land value than the sales relied on by the County. Based on its determination that residential development was the highest and best use of the property, BOTA noted that demolition costs needed to be considered in the total appraised value. Finding that Shaner's demolition estimates were reasonable, BOTA concluded that the $540,000 valuation of the racetrack facility and associated land was appropriate.

*Petition for Reconsideration*

After BOTA issued its opinion, the County filed a petition for reconsideration. In its petition for reconsideration, the County argued that BOTA erred by ignoring its evidence of the highest and best use of the property and instead accepting Ruffin's proposed highest and best use. The County also argued that K.S.A. 74-2426(c)(4)(B) is unconstitutional because of its disparate treatment of a taxpayer's and a county's right to petition for review. BOTA sustained its original order, finding no argument required modification of its opinion and that it lacked jurisdiction to hear the County's constitutional claim. The County appeals.

BOTA's FINDING THAT THE COUNTY DID NOT
CONDUCT A THOROUGH HIGHEST AND BEST USE REVIEW

The County contends BOTA erred when it found "[t]he evidence does not indicate whether the [County] conducted a thorough review of the subject property to determine the highest and best use." The County first argues that this finding was erroneous because

it provided sufficient evidence to support its assessment that the current use of the property is the highest and best use. Next, the County argues that BOTA applied the wrong standard under the Uniform Standards of Professional Appraisal Practice (USPAP) in making this finding.

*Standards of Review*

We review BOTA's decisions under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. K.S.A. 74-2426(c). The County bears the burden of proving the invalidity of BOTA's actions and decision since it is the party asserting such invalidity. K.S.A. 77-621(a)(1); *In re Equalization Appeal of Wagner*, 304 Kan. 587, 597, 372 P.3d 1226 (2016).

K.S.A. 77-621(c) sets out eight standards under which an appellate court may grant relief. In this case, the County cites K.S.A. 77-621(c)(4), (c)(5), (c)(7), and (c)(8) to support its argument that relief should be granted. K.S.A. 77-621(c)(4) allows us to grant relief if an agency "erroneously interpreted or applied the law." K.S.A. 77-621(c)(5) allows us to grant relief if an agency "engaged in an unlawful procedure or has failed to follow prescribed procedure." And K.S.A. 77-621(c)(8) allows us to grant relief if BOTA's action was otherwise "unreasonable, arbitrary or capricious."

The KJRA explains how our court reviews an agency's factual determination. Under K.S.A. 77-621(c)(7) we may grant relief if the agency's action is based on a determination of fact that is not supported "by evidence that is substantial when viewed in light of the record as a whole." The phrase "in light of the record as a whole" includes evidence both supporting and detracting from an agency's finding. K.S.A. 77-621(d). As a result, we must determine whether the evidence supporting the agency's factual findings is substantial considering all the evidence. *Wagner*, 304 Kan. at 599. Evidence is substantial when a reasonable person would accept it as sufficient to support a

conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). When reviewing the evidence in light of the record as a whole, we do not "reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

*The County's Evidence of Highest and Best Use*

The County points out that under Kansas caselaw, Bradshaw's report and testimony provided substantial evidence to support a finding that the current use is the highest and best use of the property. The County reasons that since it provided substantial evidence of the highest and best use, BOTA erred when it determined that "[t]he evidence does not indicate whether the [County] conducted a thorough review of the subject property to determine the highest and best use."

In Kansas, the market value of a subject property is based on its highest and best use. *In re Equalization Appeal of Johnson County Appraiser*, 47 Kan. App. 2d 1074, 1090-92, 283 P.3d 823 (2012). Our court has identified four criteria used to determine the highest and best use of property for determining a tax valuation. The highest and best use must be (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive. *Yellow Freight System*, 36 Kan. App. 2d 210, Syl. ¶ 8.

In this case, the County's CAMA report explained that while a property's highest and best use may change over time, the current use is considered the highest and best use if there is no evidence of such change. Bradshaw testified that the County's appraisal assumed the current use was the property's highest and best use because there was no reason to believe otherwise.

As the County suggests, our court has previously held that similar evidence was sufficient to support a finding that a subject property's highest and best use is the property's continuing use. See *Johnson County Appraiser*, 47 Kan. App. 2d at 1090-92;

10

*Yellow Freight System*, 36 Kan. App. 2d at 217-19. But contrary to the County's argument, these cases do not suggest that an appraiser conducts a "thorough review" of a property's highest and best use when the appraiser merely assumes that the current use is the highest and best use. As a result, BOTA did not erroneously apply *Johnson County Appraiser* or *Yellow Freight System* by finding that the County did not conduct a thorough review of the property's highest and best use.

Moreover, BOTA's comment regarding the County's analysis is supported by substantial evidence. Despite its closure in 2008, the County assumed the highest and best use of the Woodlands was a parimutuel racetrack facility for horse and dog racing. No parimutuel racetracks have operated in Kansas since the Woodlands closed in 2008. And Bradshaw admitted that he performed no analysis on whether dog and horse racing would be financially feasible. Accordingly, we find that a reasonable person could agree with BOTA's determination that the County did not conduct a thorough review of the property's highest and best use.

*Compliance with USPAP*

The County next argues that BOTA applied the wrong standards under the USPAP in finding that "[t]he evidence does not indicate whether the [County] conducted a thorough review of the subject property to determine the highest and best use." After noting that USPAP Standard 6 applies to mass appraisals and USPAP Standards 1 and 2 apply to single-property appraisals, the County claims:

> "The County's report conforms to USPAP Standard 6 and for BOTA to hold the County's report to USPAP Standard 1 or 2 by requiring a thorough highest and best use analysis as if performing a single property appraisal would be a deviation of prescribed procedure or an error of law."

11

"Kansas law requires all appraisals to be prepared in accordance with USPAP standards." *In re Equalization Appeal of Target Corporation*, 55 Kan. App. 2d 234, 238, 410 P.3d 939 (2017). A failure by BOTA to adhere to the USPAP standards when reaching a determination may constitute a deviation from a prescribed procedure or an error of law. *Johnson County Appraiser*, 47 Kan. App. 2d at 1087.

Standard 6 of the USPAP governs the development and reporting of mass appraisals, whereas USPAP Standards 1 and 2 control the development and reporting of individual appraisals. *Yellow Freight System*, 36 Kan. App. 2d at 214. Since the County valued the Woodlands through a mass appraisal, USPAP Standard 6 applied to its appraisal. As a result, the County did not need to satisfy the requirements of USPAP Standards 1 and 2. See *Johnson County Appraiser*, 47 Kan. App. 2d at 1089-90.

USPAP Standard 6-3(a) provides: "When necessary for credible assignment results, an appraiser must . . . identify and analyze the effect on use and value of . . . [the] highest and best use of the real estate." USPAP, p. 42 (2016-2017 ed.). The comment to Standard 6-3(a) states that "[i]n considering highest and best use, an appraiser must develop the concept to the extent required for a proper solution to the appraisal problem." USPAP, p. 42 (2016-2017 ed.). When an appraiser provides an opinion of highest and best use, the appraiser must discuss how that opinion was determined in the written report of mass appraisal. USPAP, Standard 6-8, pp. 45-48 (2016-2017 ed.).

In this case, the County's report addressed highest and best use by noting "[t]he highest and best use of a property may change over time if the character of the neighborhood changes creating demand for a different use. If there is no evidence of such a change, the current use is considered the highest and best use." And at the hearing, Bradshaw explained that he assumed dog and horse racing was the highest and best use because it was the current use. When considering nearly identical circumstances, our court has found that the county's evidence of highest and best use satisfied the

requirements of USPAP Standard 6. *Johnson County Appraiser*, 47 Kan. App. 2d at 1091-92.

While the County's evidence may have satisfied the minimum requirements of determining highest and best use in USPAP Standard 6, the County fails to show that BOTA erred by suggesting that the County did not conduct a thorough review of the property's highest and best use. In making the complained-of statement, BOTA did not suggest that the County failed to satisfy USPAP Standard 6 and never implied that it was requiring the County to satisfy USPAP Standards 1 or 2. Instead, the statement was part of BOTA's explanation for why it rejected the County's highest and best use determination in favor of Ruffin's when calculating the property's fair market value. In other words, BOTA did not impermissibly reject the County's highest and best use analysis by finding it violated USPAP standards, it appropriately rejected the County's determination by reasonably finding that Ruffin's analysis was more reliable.

Accordingly, the County failed to show that BOTA erred by finding that "[t]he evidence does not indicate whether the [County] conducted a thorough review of the subject property to determine the highest and best use."

BOTA'S RELIANCE ON RUFFIN'S APPRAISAL EVIDENCE

The County next contends BOTA erred by relying on Shaner's appraisal because (1) his highest and best use analysis was incomplete, and (2) he failed to consider the cost approach and income approach to determine whether his valuation was reasonable.

As previously stated, we may grant relief if the agency (1) erred in interpreting or applying the law, (2) failed to follow prescribed procedures, (3) based its action on a determination of fact not supported by substantial evidence when viewed in light of the entire record, or (4) ruled in a way that was otherwise unreasonable, arbitrary, or

13

capricious. K.S.A. 77-621(c)(4), (c)(5), (c)(7), and (c)(8). The County bears the burden to prove that BOTA's decision is invalid. K.S.A. 77-621(a)(1).

*Shaner's Highest and Best Use Analysis*

The County first argues that BOTA erred by relying on Shaner's appraisal because he failed to analyze whether any use, other than vacant land held for residential development, would be more productive for the property. The County claims that because of this deficiency, Shaner failed to adequately address the maximum productivity component of the highest and best use analysis. Although the County does not specify which subsection under K.S.A. 77-621 would entitle it to relief, we discern that the County is relying on subsection (c)(8) to suggest that BOTA's reliance on Shaner's highest and best use analysis was unreasonable.

To support its argument, the County relies on an excerpt from *Property Assessment Valuation* produced by the International Association of Assessing Officers, which states that assessing maximum productivity "requires the appraiser to determine which use, from among all uses that are physically possible, legally permissible, and financially feasible, produces the highest rate of return or value to the property being appraised." *Property Assessment Valuation*, International Association of Assessing Officers, p. 31 (3d ed. 2010).

However, contrary to the County's claims, Shaner considered uses other than residential development when determining the highest and best use of the property. Because the property was in disrepair and attendance for dog and horse racing was in decline, Shaner found that resuming horse and dog racing in the existing improvements was not financially feasible. He also considered modifying the existing use by fixing the structures and adding slot machines. But Shaner concluded that such modifications would

14

only be economically beneficial if the State's share of slot machine income was reduced. Still, attempts to lower the State's share have been unsuccessful.

Because the improvements contributed to no economically viable use, Shaner determined that demolition and redevelopment presented the only productive use of the land. While Shaner noted that the vacant property could allow for numerous potential uses, residential subdivision development would conform to the pattern of land use in the market area.

Shaner's appraisal sufficiently addressed the issue of highest and best use, and BOTA reasonably relied on Shaner's analysis. Although the County asserts that Shaner should have thoroughly analyzed more potential uses, "[t]he highest and best use analysis is not intended to be an exhaustive analysis of every possible use for the subject property." *Property Assessment Valuation*, International Association of Assessing Offices, p. 32 (3d ed. 2010). Notably, our court has found that BOTA appropriately relied on less extensive analysis to determine the issue of highest and best use. See *Yellow Freight System*, 36 Kan. App. 2d at 217-19 (holding that an appraiser's assumption that a property's current use is the highest and best use provides sufficient evidence to support BOTA's determination on the issue).

While questions may exist regarding some of the assumptions underlying Shaner's highest and best use analysis, we find nothing that so undermines it that a reasonable person could not accept his conclusion that the highest and best use of the Woodlands is residential development after removing the current structures. See *In re Equalization Appeal of Target Corporation*, No. 111,602, 2015 WL 2131691, at *4 (Kan. App. 2015) (unpublished opinion). BOTA did not err by relying on Shaner's highest and best use analysis.

*Valuation Approaches*

The County next argues that BOTA erred by relying on Shaner's appraisal because he failed to analyze the cost approach or the income approach of valuation to determine whether his appraisal was reasonable.

Each parcel of real property must be appraised at its fair market value. K.S.A. 79-501. "Fair market value" is the amount of money that a well-informed buyer would be justified in paying and a well-informed seller would be justified in accepting for the property in an open and competitive market. K.S.A. 79-503a.

There are three recognized approaches for determining the fair market value of property:  (1) the sales-comparison approach, which uses sales of comparable properties to estimate value; (2) the cost approach, which uses the cost of the land and replacement of the buildings minus depreciation to estimate value; and (3) the income approach, which uses the anticipated income generated from the property to estimate value. See *Wagner v. State*, 46 Kan. App. 2d 858, 861, 265 P.3d 577 (2011); *In re Tax Appeal of Porter House Apartments*, No. 108,579, 2013 WL 6726257, at *3 (Kan. App. 2013) (unpublished opinion). "All appraisers must consider and apply the three approaches to value in order to determine the fair market value of property when data to perform each approach is readily available." 46 Kan. App. 2d at 861 (quoting PVD Directive No. 98-033). However, utilization of all three approaches may not be appropriate when valuing certain types of property. See *In re Tax Appeal of Porter House Apartments*, 2013 WL 6726257, at *3.

The three valuation approaches are embodied in K.S.A. 79-503a. *Johnson County Appraiser*, 47 Kan. App. 2d at 1087. This statute provides a nonexhaustive list of factors for appraisers to consider in connection with cost and income when valuing property, including:

- The classification of lands and improvements. K.S.A. 79-503a(a).

- The size and location of the property. K.S.A. 79-503a(b)-(c).

- Depreciation, which can include physical deterioration and functional, economic, or social obsolescence. K.S.A. 79-503a(d).

- The cost of reproducing the improvements. K.S.A. 79-503a(e).

- Productivity while taking into consideration all government restrictions. K.S.A. 79-503a(f).

- The property's earning capacity. K.S.A. 79-503a(g).

- Sale value on the open market. K.S.A. 79-503a(i).

- A comparison with the value of property that has known and recognized value. K.S.A. 79-503a(k).

In this case, Shaner considered the factors listed in K.S.A. 79-503a when appraising the Woodlands. Shaner noted that the tract was zoned for agricultural use and a special use permit allowed horse racing and casino use on the property. But Shaner believed that the property could likely obtain a zoning change to allow for medium-density, single-family residential use given the surrounding uses. In valuing the property, Shaner considered the large size and accessible location of the property.

After examining the physical deterioration of the buildings and economic obsolescence of their intended use for dog and horse racing, Shaner found that the improvements had no remaining economic life. Since continuing use of the current improvements would not be economically productive, Shaner determined that demolition and redevelopment was the highest and best use of the property. Therefore, Shaner valued the property as vacant land after subtracting the cost of demolition.

To value the land, Shaner used the sales-comparison approach, noting that site value is most often estimated using that approach. Shaner did not develop a valuation

based on the cost approach or the income approach. He explained that all the approaches to value were considered, but only a land valuation based on the sales-comparison approach was developed given the property's highest and best use.

BOTA reasonably relied on Shaner's appraisal even though he developed a valuation based only on the sales-comparison approach. Given that demolition and redevelopment represent the highest and best use of the property, a well-informed buyer would not be justified in paying more for the costs of reproducing the same buildings that would be removed. Because the cost approach would add the value of the property's improvements to the appraisal, it would not produce the fair market value of the property.

Additionally, Shaner reasonably determined that an income approach was an inappropriate method to value the property. The Woodlands has been closed and has generated no income since 2008. And Shaner determined that continuing the use of the existing improvements or modifying the improvements' current use would not be profitable. Accordingly, Shaner's appraisal provided substantial evidence to support BOTA's valuation even though he relied on the sales-comparison approach.

BOTA did not err by relying on Shaner's appraisal.

CONSTITUTIONALITY OF K.S.A. 74-2426(c)(4)(B)

The County next contends that K.S.A. 74-2426(c)(4)(B) violates its rights under the Due Process Clause and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, as well as its rights under Section 1 of the Kansas Constitution Bill of Rights. The County claims that the statute violates its due process and equal protection rights because it allows only a taxpayer and not a taxing authority to petition for review in a district court.

18

Whether a statute is constitutional is a question of law over which we exercise unlimited review. *Solomon v. State*, 303 Kan. 512, 523, 364 P.3d 536 (2015). When faced with a constitutional challenge, we presume the statute is constitutional and resolve all doubts in favor of a statute's validity. *State v. McLinn*, 307 Kan. 307, 344, 409 P.3d 1 (2018). Moreover, we must interpret a statute in a manner that renders it constitutional if there is any reasonable way to do so. "Before a statute may be struck down, the constitutional violation must be clear." *Solomon*, 303 Kan. at 523.

In an appeal of an order by BOTA, any aggrieved party may file a petition for review in the Court of Appeals. K.S.A. 74-2426(c)(4)(A). But a taxpayer is given the option to first appeal by filing a petition for review in the district court. K.S.A. 74-2426(c)(4)(B). If a taxpayer chooses to appeal to the district court, the district court must conduct a trial de novo, meaning the court tries the matter anew and decides it independently, based solely on the evidence presented in the district court. See K.S.A. 74-2426(c)(4)(B); *Manzano v. Kansas Dept. of Revenue*, 50 Kan. App. 2d 263, 268, 324 P.3d 321 (2014). The County argues that providing the remedy of a de novo trial before the district court to a taxpayer but not a taxing authority violates its due process and equal protection rights.

However, the County lacks the ability to challenge the constitutionally of K.S.A. 74-2426(c)(4)(B) on Fourteenth Amendment grounds. Our Supreme Court has noted that "local governments do not have standing to invoke the protection of the Fourteenth Amendment to the United States Constitution against the actions of state government." *Gannon v. State*, 298 Kan. 1107, 1133, 319 P.3d 1196 (2014). As a result of this rule, "political subdivisions of a state lack standing to challenge the validity of a state statute on Fourteenth Amendment grounds." *City of Moore v. Atchison, Topeka, & Santa Fe Ry. Co.*, 699 F.2d 507, 511-12 (10th Cir. 1983). Since the County is a political subdivision of Kansas, see *State ex rel. Tomasic v. Kansas City*, 237 Kan. 572, 585, 701 P.2d 1314

(1985), it lacks standing to challenge the validity of K.S.A. 74-2426(c)(4)(B) on Fourteenth Amendment grounds.

Similarly, the County may not rely on Section 1 of the Kansas Constitution Bill of Rights to challenge the constitutionally of K.S.A. 74-2426(c)(4)(B). This section provides that "[a]ll men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." Kan. Const. Bill of Rights, § 1.

Our Supreme Court has found that local governments are not "persons" as that term is used in Section 18 of the Kansas Constitution Bill of Rights. *Gannon*, 298 Kan. at 1134. In *Gannon*, the court noted United States Supreme Court caselaw finding that local governments may not invoke Fourteenth Amendment protections against actions of the state. 298 Kan. at 1133. Since Kansas courts typically construe the due process protections of Section 18 to be the same as those guaranteed by the Fourteenth Amendment, the *Gannon* court held that school districts lacked standing to raise a due process claim under Section 18 because they are local governments. 298 Kan. at 1134.

Like Section 18 addressed in *Gannon*, Section 1 of Kansas' Bill of Rights is "given much the same effect as the Equal Protection Clause of the Fourteenth Amendment." *State ex rel. Tomasic*, 237 Kan. at 583. And like in *Gannon*, we construe a political subdivision's ability to invoke Section 1 to challenge the constitutionality of a statute in line with the Fourteenth Amendment and find that it lacks standing to do so. Accordingly, we dismiss the County's constitutional claims for lack of standing. See *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 750, 189 P.3d 494 (2008).

Affirmed in part and dismissed in part.